**ALABAMA MUNICIPAL DIS-
TRIBUTORS GROUP, et
al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

**Southern Natural Gas Company,
et al., Intervenors.**

No. 01–1299.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 1, 2002.

Decided Dec. 17, 2002.

Joshua L. Menter argued the cause for petitioners and supporting intervenors. With him on the briefs were William T. Miller and James R. Choukas–Bradley. L. Clifford Adams Jr. entered an appearance.

Beth G. Pacella, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were Cynthia A. Marlette, General Counsel, and Dennis Lane, Solicitor. Lona T. Perry and Monique L. Watson, Attorneys, entered appearances.

Patrick B. Pope, R. David Hendrickson, Howard L. Nelson, Roy R. Robertson, Jr., Lyle D. Larson and Bridget E. Shahan were on the brief for intervenors Southern Natural Gas Company, et al., in support of respondent. Daniel F. Collins and Donna J. Bailey entered appearances.

Before: RANDOLPH and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed By Senior Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Senior Circuit Judge:

Petitioners either are purchasers or represent purchasers of gas transported on Southern Natural Gas Company's pipeline system. They protest the Federal Energy Regulatory Commission's grant to Southern of a certificate of public convenience and necessity for construction and operation of pipeline facilities intended to provide fuel to Southern Company Services ("SCS") for some new gas-fired power facilities planned by SCS for Alabama. See § 7(c)(1)(A) of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A) (requiring certification for new service). Their specific objection is to FERC's having certificated the transaction at discount rates, lower than those paid by petitioners. We dismiss the petition for want of jurisdiction.

\* \* \*

In deciding exactly where to locate new gas-fired electric generation facilities, SCS sought to have the gas delivered as economically as possible. At least two potential carriers were available, Southern and Transcontinental Gas Pipe Line Corporation. Competition between the two carriers evidently ensued—or so FERC concluded, over objections by petitioners that the appearance of competition was illusory. Hence in seeking certification Southern claimed that it could not have won the SCS business without offering discounted rates. The Commission was persuaded, and approved Southern's application for a certificate embodying the proposed initial rates. *Southern Natural Gas Co.*, 94 FERC ¶ 61,297, 2001 WL 275016, *order on reh'g*, 95 FERC ¶ 61,220, 2001 WL 537615 (2001).

At the outset FERC and a group of intervenors (SCS, Southern and another pipeline) raise jurisdictional issues. FERC questions petitioners' standing, specifically whether they have suffered or are in imminent peril of suffering injury in fact—"invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual and imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). And the intervenors argue that petitioners' claims are unripe, a claim that the court could in fact raise on its own. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 2495 n. 18, 125 L.Ed.2d 38 (1993). The ripeness inquiry is familiar: we must evaluate the "fitness of the issues for judicial decision

and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). The two issues overlap significantly, as we shall see. The contingencies that stand between the orders here and any injury to petitioners tend both to show the injury's lack of imminence and to render their claim unripe.

As one basis for standing, petitioners claim that FERC's allegedly improper certification will raise demand for gas in the region, and thus the prices they will pay for gas. But they are unable to demonstrate any connection between the allegedly improper FERC action and higher prices. It is likely true that construction and operation of the SCS facility will increase the regional demand for gas. But petitioners nowhere suggest that SCS was contemplating use of any other fuel for its new facilities; indeed, the assumption that SCS had already settled on gas was the basis for petitioners' proclaiming that the case raised fundamental issues of gas-on-gas competition. See Petitioners' Initial Br. at 3–4. Nor do petitioners suggest that without a discount SCS might have completely abandoned any plan for new generation facilities. So the only way Southern's transportation discount could raise demand would be if it were to cause SCS's delivered gas costs to be lower than they would otherwise have been, and thus its electricity prices to be ever so slightly lower than they would have been, thereby driving up electricity consumption, and with it gas consumption, compared to what they would have been without the discount. But petitioners have not even mentioned this possibility, much less offered supporting empirical analysis. So we need not decide whether the possible effect is sufficiently non-speculative to support standing. See *Florida Audubon Soc'y v. Bent-*

*sen*, 94 F.3d 658, 667–68 (D.C.Cir.1996) (*en banc*).

At oral argument petitioners hinted at a related theory of standing based on direct competitive injury—specifically, that the lower electricity costs that might result from this discount could prompt consumers to choose electricity over gas for their energy needs. But petitioners never made such an argument in their briefs, and have given us no evidence of such competitive injury. Their mere invocation of the concept in response to a question from the bench is not an adequate basis for standing.

Petitioners also assert that the Commission's action here will adversely affect them as users of Southern's transportation services. Here an initial hurdle to their claim of injury is their acknowledgement that they will ultimately benefit from Southern's service to SCS. Because a carrier's unit rate is normally determined by dividing its total throughput into its "revenue requirements" (i.e., total cost), see *Interstate Natural Gas Ass'n of America v. FERC*, 285 F.3d 18, 56 (D.C.Cir.2002) (*"INGAA"*), an increase in throughput will decrease the unit rate, unless there is a more-than-offsetting rise in average costs. As there is no evidence of such a rise in average costs, it appears undisputed that once Southern adopts system rates reflecting the new service, the effect will be to reduce petitioners' rates.

Thus petitioners' claim is not that they will be worse off under the Commission orders than if there were *no* SCS–Southern transaction, but that they will be worse off than under a Commission decision by which Southern carried the SCS gas but at a lower discount or none at all. This argument draws on the Commission's practice of making "discount adjustments." In dividing throughput into cost to yield a unit rate, the Commission makes a down-

ward adjustment to the volume of throughput expected under a discount, to reflect the reality that its contribution to revenue will be lower than that of a similar volume carried under undiscounted rates. *INGAA*, 285 F.3d at 56. But the Commission grants these adjustments only if it finds the discount to have been required by competitive conditions. See *Williston Basin Interstate Pipeline Co.*, 67 FERC ¶ 61,137 at 61,378–80, 1994 WL 235474 (1994), *order on reh'g*, 71 FERC ¶ 61,019, 1995 WL 148310 (1995). Some critics of the Commission contend that where the only competition is from another gas pipeline—as is evidently true here—this constraint on discounts and discount adjustments is not enough. For gas-on-gas competition, they say, discounts and discount adjustments do not increase overall gas transportation but merely shift it among pipelines, giving competitive customers a lower rate but forcing the non-competitive customers to shoulder a higher proportion of fixed costs. See *INGAA*, 285 F.3d at 57. The Commission has promised to review this issue more fully. *Id.*

The orders that petitioners challenge here do not resolve or even tackle the issue of what discount adjustment, if any, the Commission should allow. The effect that the SCS transaction will have on petitioners' rates will be decided in Southern's next rate case under § 4 of the Natural Gas Act, 15 U.S.C. § 717c (or conceivably in a Commission-initiated rate proceeding under § 5, 15 U.S.C. § 717d). What that precise effect will be, no one can now say. The injury has not yet materialized nor has the factual record related to that injury been established. The case closely parallels *Mississippi Valley Gas Co. v. FERC*, 68 F.3d 503 (D.C.Cir.1995), where "the future impact of the FERC orders [embodying its discount adjustment policy was] uncertain ..., and [would] likely be

more clear once [the] actual rates ... have been finalized" in the then pending § 4 rate cases, and we accordingly found attacks on the policy not fit for judicial review. *Id.* at 509. As there was no showing that delay of adjudication would inflict hardship, we found the claim unripe. *Id.* at 509–10. Because the petitioners' theory of an immediate impact on the price of gas has failed, and no rate change (of whatever degree) will take effect independently of Southern's next rate case, here too delay will cause them no harm. See also *New York State Elec. & Gas Corp. v. FERC*, 177 F.3d 1037, 1040–41 (D.C.Cir.1999) (finding a rate-related claim unripe before completion of the actual rate proceeding under § 4).

Petitioners argue, however, that in a future § 4 proceeding their claims will be compromised by the Commission's determinations here. They say that the test for allowing a discount adjustment in a rate proceeding is essentially the same as for allowing a discount in a § 7 certification, and that the current ruling will be binding on them when that issue is resolved in the § 4 rate case. The Commission is somewhat obscure on the relationship between the two proceedings, stressing only that the burden will be on the pipeline to justify any discount adjustment. Commission Br. at 31–32. Although petitioners present the argument in the context of standing, it would—if correct—tend to supply ripeness as well: if failure to obtain judicial review now would lead to dispositive issue preclusion, petitioners' hardship would be severe indeed.

In so far as petitioners rely on precedential effect *within the Commission*, they assert a type of "injury" that is clearly insufficient to satisfy our Article III jurisdictional requirements. *Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C.Cir.1998). Obviously the Commis-

sion's decision here will not be a binding precedent for any reviewing court. But petitioners suggest that the adverse administrative determination here might bind them, via collateral estoppel, in a later judicial review of the § 4 rate setting. They argue that this possible effect might confer Article III standing, citing our dictum in *International Brotherhood of Electrical Workers v. ICC* ("*IBEW*"), 862 F.2d 330, 334 (D.C.Cir.1988).

In *Sea-Land* we discussed but did not resolve whether the possibility of a collateral estoppel effect could afford standing. As we noted, neither *IBEW* nor any decision of the Supreme Court had actually found standing on the basis of collateral estoppel. *Sea-Land,* 137 F.3d at 648. We thought the issue complicated and possibly circular, in that if there were appealability, and if the other prerequisites of collateral estoppel were present, then collateral estoppel would follow; whereas absent appealability there would be no basis for collateral estoppel under standard doctrine. *Id.* at 648–49.

But in fact it seems inescapable that neither standing nor ripeness could properly grow out of a harm predicated on a potential collateral estoppel effect. The argument for standing would necessarily have a bootstrap quality: it would infer standing in an initial case from the possibility of collateral estoppel in a later one— a possibility that of course could only materialize *if* standing were found in the first case. To create standing out of the preclusive effect that *would* flow from granting standing is to create it ex nihilo. In contrast, our denial of standing here necessarily implies that petitioners may not be estopped from challenging these findings in a later court case. *Sea-Land,* 137 F.3d at 648. Whatever weight the present orders may have in the Commission, in court petitioners will be able to point to

any errors in the present agency action that prove to affect their interests adversely in the rate case. For the same reasons, collateral estoppel possibilities could not ripen an otherwise unripe claim.

As we lack jurisdiction to hear petitioners' claims, we dismiss their petition. That dismissal moots FERC's contention that the interventions on petitioners' behalf must be dismissed because of those intervenors' failure to seek rehearing as required by § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

*So ordered.*