AT&T CORPORATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

Atlas Telephone Company, Inc., and Total Telecommunications Services, Inc., Intervenors.

Nos. 01–1188 and 01–1201.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 2002.

Decided Jan. 24, 2003.

Russell M. Blau argued the cause and filed the briefs for petitioners Atlas Telephone Company, Inc. and Total Telecommunications Services, Inc.

Daniel Meron argued the cause for petitioner AT&T Corporation. With him on the briefs were David W. Carpenter, Mark C. Rosenblum, and Peter H. Jacoby. Peter D. Keisler entered an appearance.

Richard K. Welch, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were

John Rogovin, Deputy General Counsel, John E. Ingle, Deputy Associate General Counsel, and Laurel R. Bergold, Counsel, and Marion L. Jetton and Robert B. Nicholson, Attorneys, U.S. Department of Justice.

Daniel Meron, C. John Buresh, David W. Carpenter, Mark C. Rosenblum and Peter H. Jacoby were on the brief for ·intervenor AT&T Corporation.

Russell M. Blau was on the brief for intervenors Atlas Telephone Company, Inc. and Total Telecommunications Services, Inc.

Before: GINSBURG, Chief Judge, SENTELLE, Circuit Judge, and SILBERMAN, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

Atlas, Total, and AT&T appeal different parts of a single order of the Federal Communications Commission. The Commission held that Atlas, an incumbent local exchange carrier (ILEC), created Total, ostensibly a competitive access provider, as a sham entity solely in order to increase the rates charged to AT&T, an interexchange carrier (IXC), and thereby engaged in an unjust and unreasonable practice, in violation of § 201(b) of the Communications Act of 1934, 47 U.S.C. § 151 *et seq*. The Commission also held that AT&T had legitimately blocked calls to Total; Atlas must pay damages to AT&T in the amount that AT&T paid to Atlas for tandem switched transport; and AT&T is liable to Atlas for reasonable access charges. The Commission then dismissed AT&T's counterclaim under the Telephone Disclosure and Dispute Resolution Act (TDDRA), 47 U.S.C. § 228, "as moot, without prejudice."

We reject all Atlas' claims and deny its petition for review. We reject the Commission's argument that AT&T does not have standing to seek review of the Order, the preclusive effect of which could prejudice AT&T in defending against Total's pending lawsuit to collect access charges. We grant in part AT&T's petition for review and remand the Order to the Commission to consider AT&T's argument that Total did not provide access service and to clarify the effect of its having dismissed AT&T's counterclaim.

## I. Background

Atlas Telephone Co., Inc. is the ILEC in Big Cabin, Oklahoma, where it serves approximately 1,500 customers. Atlas provides local exchange service to the end users and provides originating and terminating access service to IXCs. Total Telecommunications Services, Inc., formed in 1995, offers service to only one customer, Audiobridge of Oklahoma, Inc., which runs a free chat-line service allowing multiple callers to dial in and talk to one another. During the relevant time period, a long-distance call to Audiobridge placed by an AT&T customer went through that customer's local telephone company to AT&T, which provided interexchange service by transporting the call across its network to a point of presence (POP) located near Big Cabin and served by Southwestern Bell Telephone Company. From the POP, Southwestern Bell transmitted the call through its facilities to a "meet point" with Atlas, which then carried the call through its tandem switch to Total. As the "terminating access provider," Total completed the call to Audiobridge. (Total provided no local exchange or originating access service.)

Atlas and Total have a close relationship — to say the least. The President of Atlas is the Chairman of Total's Board of Directors; Total received a $20,000 startup loan from the Atlas pension fund; Total's

only office is in an Atlas building; and Total leased all its transmission facilities from Atlas.

As an ILEC, Atlas was subject to "dominant carrier" regulation of its rates and therefore had to get its tariffs preapproved by the Commission. To that end, Atlas elected to charge the rates in the tariff filed by the National Exchange Carriers Association (NECA), which prepares and files a joint tariff on behalf of 1100 small ILECs. NECA participants pool their revenues, and each receives an amount equal to its costs and its *pro rata* share of all earnings. Thus, for calls to Audiobridge, Atlas charged AT&T the tandem switching transport fee in the NECA tariff.

In July 1995 Total, as a non-dominant carrier, filed its own tariff, which was effective immediately, pursuant to which it charged AT&T at a rate 27 percent higher than what Atlas was charging under the NECA tariff. Total then split with Audiobridge the revenues Total received from AT&T. This was Audiobridge's only source of income.

Total began completing calls from AT&T customers to Audiobridge in August 1995. When AT&T received from Total unexpected bills for terminating access service — in addition to Atlas' bills for tandem switching transport — and found out about the relationship between Total and Atlas, it first threatened to, and starting on November 22 did, block calls from its customers to Audiobridge. AT&T also refused to pay Total, which had already terminated about 10 million minutes of calls. Unbeknownst to AT&T, in July 1996 Total gave Audiobridge different numbers that AT&T did not block.

On November 24 Atlas and Total filed suit against AT&T in the United States District Court for the Northern District of Oklahoma. That court referred the case to the Commission pursuant to the doc-

trine of primary jurisdiction. *See Total Telecommunications, Inc. v. AT&T*, Civ. Action. No. 95–C–1163 (N.D. Okla.); *see also Reiter v. Cooper*, 507 U.S. 258, 268–69, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993). Atlas and Total then brought essentially the same suit in the United States District Court for the District of Columbia, with the same result. *See Total Telecommunications Services, Inc. v. AT&T Co.*, 919 F.Supp. 472, 483–84 (D.D.C.1996), *aff'd*, 99 F.3d 448 (D.C.Cir. 1996).

Finally Atlas and Total filed a complaint with the Commission, alleging that AT&T's blocking calls to Audiobridge violated the Communications Act of 1934. AT&T counterclaimed, alleging that Atlas and Total had violated the Act by creating a sham entity and charging unreasonable rates.

The Commission denied Atlas' and Total's claims. 16 F.C.C.R. 5726, 2001 WL 830660 (2001) (*Order*). The Commission first concluded that "Atlas created Total as a sham entity designed to impose increased access charges on calls made to Audiobridge." *Id.* at ¶ 14. Therefore, the Commission held, Atlas and Total had engaged in an unjust and unreasonable practice, in violation of 47 U.S.C. § 201(b). *Order*, 16 F.C.C.R. 5726 at ¶¶ 15–18. As a consequence, AT&T did not have an obligation under 47 U.S.C. § 201(a) to complete calls to Audiobridge through Total: "Requests by AT&T's customers to send traffic to Audiobridge via Total do not constitute 'reasonable requests' for service for purposes of section 201(a), because they would require AT&T to purchase access service that we have previously determined is unreasonably priced and the product of a sham arrangement." *Id.* at ¶ 21.

Atlas and Total had argued that AT&T's blocking calls also violated the IXC's duty

under 47 U.S.C. § 251(a)(1) to "interconnect *directly or indirectly with the facilities and equipment of other telecommunications carriers.*" The Commission rejected that argument, too, reading the text and structure of the Act, along with its own regulation defining "interconnection," to mean that "interconnect" refers to a "physical linking of two networks, and *not* to the exchange of traffic between networks." *Id.* at ¶ 23 (emphasis in original).

The Commission denied in part and granted in part AT&T's counterclaims. Whereas AT&T had argued that it should pay nothing to Atlas and Total, the Commission concluded that AT&T would have to pay a "reasonable access charge," which in this case was "the fee that Atlas would have charged AT&T for terminating traffic *directly to Audiobridge,* had Total never existed," *id.* at ¶ 38, and that the NECA tariff supplied the appropriate rate. *Id.* at ¶ 39. The Commission, however, did not order AT&T to pay Atlas and Total because, it determined, they had failed in their complaint explicitly to "state a claim for relief based on [the calls made by AT&T customers from August 1 to November 22, 1995]." *Id.* at ¶ 37 n. 82. (The Commission did not advert to AT&T's possible liability for access charges with respect to calls made by AT&T customers to Audiobridge after July 1996, when Total activated the new numbers.) The Commission also held that Atlas should pay damages to AT&T in the amount AT&T had paid Atlas for tandem switched transport because "[b]ut for its unlawful relationship with Total, Atlas would not have charged AT&T anything at all for tandem switched transport to Total." *Id.* at ¶ 40. Finally, the Commission dismissed "as moot, without prejudice" AT&T's claim that Atlas and Total violated the TDDRA; even if Atlas and Total violated the TDDRA, the Commission stated, that violation "would not vitiate AT&T's obligation to pay a reasonable access charge for ser-

vices already provided." *Order,* 16 F.C.C.R. 5726 at ¶ 41.

## II. Analysis

Atlas and Total, which filed a joint brief, and AT&T each challenge various aspects of the *Order.* Atlas/Total argues that the Commission erred in (1) finding that Total was a sham entity; (2) interpreting "reasonable request" in § 201(a); (3) interpreting "interconnect" in § 251(a)(1); (4) ordering Atlas to refund tandem switched transport charges; and (5) denying Total a remedy for AT&T's refusal to pay for access services. AT&T (1) complains that the Commission failed to address its claim that Total did not provide "access service," and argues that the agency (2) arbitrarily resolved its unreasonable rate claim, and (3) erred in dismissing its counterclaim (in the nature of a defense) under the TDDRA. We may set aside the *Order* only insofar as it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### A. The Atlas/Total Petition

#### 1. Total as a sham entity

■ Section 201(b) of the Act declares unlawful "any [communication common carrier's] charge, practice, classification, or regulation that is unjust or unreasonable." The Commission found that "Atlas created Total as a sham entity designed solely to extract inflated access charges from IXCs, and that this artifice constitutes an unreasonable practice ... in violation of section 201(b) of the Act." *Order,* 16 F.C.C.R. 5726 at ¶ 16. Atlas/Total does not quarrel with the underlying facts upon which the Commission based its determination that Total was a sham entity. Rather, Atlas/Total argues that the "FCC's finding that Total was a sham entity because it was not truly independent of Atlas is in-

consistent with many past FCC rulings concerning affiliates of dominant carriers," such as those allowing an affiliate to sell cellular or interexchange service. In response, the Commission points out that those rulings involved an affiliate offering a competitive service; the provision of access service by an ILEC, in contrast, is subject to dominant carrier rate regulation, which would be circumvented if an ILEC could offer access service through an affiliate. The Commission also argues that because Total is not independent of Atlas, those prior decisions do not apply.

We agree with the Commission in both respects. None of the cases cited by Atlas/Total supports the proposition that an ILEC may create an alter ego to provide access service in the same geographic area as the ILEC and thereby avoid regulation as a dominant carrier. If accepted, Atlas/Total's argument would enable every ILEC completely to avoid dominant carrier regulation by a mere artifice. In this respect, it is noteworthy that, although the Commission determined that "Atlas created Total to increase access charges for calls to Audiobridge," *id.*, Atlas/Total does not argue on appeal that Total had any other purpose, or indeed that it had any economic substance at all. Clearly, the entire arrangement was devised solely in order to circumvent regulation of Atlas as a dominant carrier, deserves to be treated as a sham, and cannot benefit from precedents set with respect to legitimate affiliates.

2. Section 201(a) "reasonable requests"

 Section 201(a) of the Act provides that a communications common carrier has a duty to "furnish ... communication service upon reasonable request." 47 U.S.C. § 201(a). The Commission determined that an AT&T customer who called Audiobridge was not thereby making a "reasonable request" for service because AT&T would have had to purchase a service that was "unreasonably priced and the product of a sham arrangement." *Order,* 16 F.C.C.R. 5726 at ¶ 21. Because the Congress has not "directly spoken to the precise question at issue," we must decide whether the Commission permissibly construed the statute. *Chevron USA, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

Atlas/Total argues the Commission misinterpreted § 201(a) because AT&T's refusal to serve customers who wanted to call Audiobridge frustrated the goal of universal service assertedly underlying that section. According to Atlas/Total, instead of unilaterally blocking calls to Audiobridge, AT&T should have paid Total and then sought a refund by filing a complaint with the Commission pursuant to § 208 of the Act. The Commission responds that AT&T could legitimately block service because Total was a sham entity.

If, as Atlas/Total suggests, AT&T could not refuse as "unreasonable" a request for service the provision of which would have required it in turn to procure a service available only at an unreasonable price from a sham entity, then the modifier "reasonable" in § 201(a) would have little if any meaning. The inclusion of that term in the statute implies that a common carrier may lawfully deny service to a customer in some circumstances, whatever its effect upon universal service. The question is, were there here such circumstances or, more precisely, could the Commission reasonably so conclude? Surely the answer is yes.

As a rule, grievances are to be raised, as Atlas/Total says, via § 208 and not by resort to self-help. The Commission itself has so stated. *See, e.g., Bell Atlantic–Delaware v. Frontier Communications Services, Inc.,* 15 F.C.C.R. 7475, ¶ 9, 2000 WL 423068 (2000) ("[T]he proper way for

an IXC to challenge a LEC's [rate] is to initiate a Section 208 proceeding at the Commission"). Here the Commission recognized an exception to the rule, that allowing an IXC to block calls when a sham entity is charging it unreasonable rates for access services. If the Commission later held that Total was not a sham entity or that Total had charged reasonable rates, then the agency presumably would have found AT&T liable to Total for blocking the calls. In other words, by blocking calls to Audiobridge AT&T was acting at its peril. *Elkhart Telephone Co., Inc. v. Southwestern Bell Telephone Co.*, 11 F.C.C.R. 1051, ¶ 34, 1995 WL 686560 (1995) ("Those who choose the course of non-compliance are on notice that they will be acting at their own peril, should the question of the legitimacy of their refusal to meet their common carrier obligations be decided against them").

The Commission's decision is not inconsistent with its precedents: None of the cases Atlas/Total cites for the proposition that AT&T first had to file a complaint with the Commission involved a sham entity. Nor do we see how the seemingly narrow exception for a sham entity charging an unreasonable rate will swallow the rule of § 208, as Atlas/Total predicts. The Commission specifically declined "to address the broader question of what other circumstances might permit an IXC to refuse to purchase, or discontinue purchasing, access service from a competitive LEC." *Order*, 16 F.C.C.R. 5726 at ¶ 21 n. 50. Any carrier that engages in self-help, therefore, runs the risk that the Commission will find against it — even if its underlying position is vindicated — and hold it liable solely for engaging in self-help. In these circumstances, the Commission's judgment that it has not opened Pandora's box is surely reasonable.

### 3. Section 251(a)(1) "interconnect"

Section 251(a)(1) provides in part that "[e]ach telecommunications carrier has the duty ... to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers." In the *Order*, the Commission interpreted this duty to "interconnect" as referring "solely to the physical linking of two networks, and *not* to the exchange of traffic between networks." 16 F.C.C.R. 5726 at ¶ 23 (emphasis in original).

Atlas/Total argues that "the duty ... to interconnect" in § 251(a)(1) "encompasses the duty to exchange traffic" between networks, not just the duty to establish a physical linkage between networks. Atlas/Total contends that (1) the history of the requirement of interconnection and the legislative history of § 251 both indicate that to "interconnect" means to exchange traffic, and (2) the meaning given to "interconnect" in the *Order* (a) ignores the phrase "or indirectly" in § 251(a)(1), and (b) does not comport with 47 C.F.R. § 51.5. We review the Commission's interpretation of "interconnect" under the two-step test of *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82, looking first to the intent of the Congress and then, if the term is still ambiguous, determining whether the agency's construction of the statute is a reasonable one. Here we need not go beyond the first step.

As the Commission points out, both the text of § 251(a)(1) and the structure of § 252 strongly indicate that to "interconnect" and to exchange traffic have distinct meanings. The former section refers only to "facilities and equipment," not to the provision of any service. *See also Competitive Telecommunications Ass'n v. FCC*, 117 F.3d 1068, 1072 (8th Cir.1997) (stating of § 251(c)(2), "By its own terms, this reference is to a physical link, between the equipment of the carrier seeking intercon-

nection and the LEC's network"). The latter section, which establishes pricing standards for agreements between carriers, provides separately for "interconnection and network element charges" (§ 252(d)(1)) and for "charges for transport and termination of traffic" (§ 252(d)(2)). Section 252 thus contemplates the very distinction between physical linkage and exchange of traffic the Commission applied in the *Order*.

Atlas/Total argues that the Commission's definition of "interconnect" ignores the phrase "or indirectly": "If AT&T were not required to exchange traffic with Atlas or Total, and is not required to establish a physical connection to their facilities, then section 251(a)(1) would not require AT&T to do anything at all." But Atlas/Total has no basis for saying AT&T is not required to establish a physical connection with them; the Commission has never said that, and in fact AT&T does connect indirectly with Atlas through a meet point established by Southwestern Bell. Nothing in the Commission's approach, therefore, deprives the term "indirectly" of a role in the statute. Because "we do not resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147–48, 114 S.Ct. 655, 662, 126 L.Ed.2d 615 (1994), we do not consider Atlas/Total's argument that the background of the interconnection requirement and the legislative history of § 251 require a different interpretation of "interconnect." The Commission's definition of "interconnect" in the *Order* faithfully follows the meaning of that term in § 251(a)(1).

4. Tandem switched transport charges

■ Atlas/Total argues that the Commission should not have ordered it to refund the tandem switched transport charges paid by AT&T because Atlas would have provided and AT&T would have had to pay for the same service even if Total had never existed. We must turn first, however, to the Commission's objection that we do not have jurisdiction to address that argument because it was not raised before the Commission.

■ Section 405 of the Act bars a court from considering any issue of law or fact upon which the Commission "has been afforded no opportunity to pass." Where, as here, the issue was not raised explicitly, we must determine whether "a reasonable Commission *necessarily* would have seen the question raised before [the Court] as part of the case presented to it." *Time Warner Entertainment Co., v. FCC*, 144 F.3d 75, 81 (D.C.Cir.1998) (emphasis in original). We do so bearing in mind that Atlas/Total, as a litigant before the Commission, had "at least a modicum of responsibility for flagging the relevant issues which its documentary submissions presented." *Bartholdi Cable Co., Inc. v. FCC*, 114 F.3d 274, 280 (D.C.Cir.1997).

Atlas/Total argues that it raised the present issue in a single sentence in its opposition to AT&T's motion to dismiss and in an exhibit listing Atlas' and Total's various charges for different types of services. The sentence in question, which Atlas/Total points out was intended to rebut AT&T's claim "that Total charged 'nearly ten times' as much to terminate an AT&T call" as did Atlas, is: "A call terminated [by Atlas] at one of AT&T's own customer premises would be subject to a total charge, under NECA Tariff No. 5, of 6.63 cents, consisting of tandem switched transport and tandem switching charges plus local switching, carrier common line, RIC and an information surcharge." This sentence, which is not self-evidently about the tandem switched transport charges AT&T would have paid if Total did not exist, merely states a fact; it does not constitute an argument, let alone an argument made with the requisite clarity. *See Bartholdi*, 114 F.3d at 279 ("The Commis-

sion need not sift pleadings and documents to identify arguments that are not stated with clarity by a petitioner"). Therefore, we cannot say that a reasonable Commission "necessarily would have seen" that Atlas/Total had presented a question to the agency about payment of tandem switched transport charges. Atlas/Total claims it could not foretell the need for this specific argument. Perhaps not, but then under § 405 Atlas/Total should have filed a petition for rehearing so the Commission could consider the argument in the first instance.

■ As a fallback, Atlas/Total argues that we should loose the bond of § 405 in this case because "unreasonable delay [by the Commission] preclude[s] strict application of the exhaustion doctrine." The Commission is supposed to decide a case within 15 months after the filing of the complaint, see 47 U.S.C. § 208(b), but in this case the agency did not issue a decision for four and one half years. Atlas/Total contends that because it could have no confidence the Commission would issue a ruling on a petition for reconsideration within the 90–day deadline set in 47 U.S.C. § 405(b), it should be allowed to bypass the agency and seek judicial review at once.

The case upon which Atlas/Total relies for this argument states that "exhaustion is not required when unreasonable delay would render the administrative remedy inadequate." *Southwestern Bell Telephone Co. v. FCC,* 138 F.3d 746, 750 (8th Cir.1998). But in this case the petitioners seek only damages for AT&T's failure to pay Total's bills and for AT&T's blocking calls to Audiobridge. We fail to see how giving the Commission more than 90 days to consider the issue of AT&T's liability for tandem switched transport charges would render any resulting monetary relief inadequate.

In sum, Atlas/Total has not shown it comes within any exception to § 405. That provision therefore bars our consideration of the issue whether the Commission should have ordered Atlas to refund the tandem switched transport charges paid by AT&T.

5. Remedy for AT&T's refusal to pay

■ Atlas/Total argues that the Commission erred in denying it a remedy for AT&T's refusal to pay access charges for calls to Audiobridge between August 1, 1995 and November 22, 1995. The Commission concluded that "although [Atlas/Total's] complaint refers to AT&T's failure to pay certain access charges incurred before AT&T began blocking calls to Audiobridge the complaint does *not* state a claim for relief based on that conduct." 16 F.C.C.R. 5726 at ¶ 37 n. 82 (emphasis in original).

Unlike a complaint governed by the notice pleading system of the Federal Rules of Civil Procedure, a complaint filed with the Commission must set forth "[a]ll matters concerning a claim ... fully and with specificity" and must "complete[ly] identif[y] ... [the] conduct complained of and the nature of the injury sustained." 47 C.F.R. §§ 1.720(a), 1.721(a)(6) (1994). Atlas/Total's complaint clearly seeks damages for AT&T's having blocked service to Audiobridge but never specifically alleges that Atlas is entitled to recover from AT&T access charges for calls completed before the blocking began.

Atlas/Total tries to salvage its claim by arguing that "[t]he issue of unpaid access charges was raised in the Complaint as a component of the larger interconnection issue." There is no logical connection, however, between the alleged duty to interconnect and the payment of bills for access services; this is even more apparent once one realizes that the duty to

interconnect requires only a physical linkage of facilities, not the provision of services. Therefore, we agree with the Commission that Atlas/Total's complaint failed to state a claim for AT&T's nonpayment of access charges allegedly incurred prior to November 22, 1995.

## B. AT&T's Petition

AT&T argues that it should not be liable for access service because the Commission (1) failed to address its claim that Total did not provide "access service," (2) arbitrarily resolved its unreasonable rate claim, and (3) erred in dismissing as moot its counterclaim under § 228. The Commission, before defending the *Order* on its merits, maintains that AT&T does not have standing under Article III of the Constitution of the United States to challenge the *Order* because it has not been injured thereby. Because the question of standing goes to our jurisdiction over the case, we must consider it first. *See Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 94–95, 118 S.Ct. 1003, 1012–13, 140 L.Ed.2d 210 (1998).

### 1. Standing

■■ For standing to pursue its objections, AT&T must show that it has suffered an "actual or imminent injury," that the conduct of which it complains caused that injury, and that a favorable decision of the Court would redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). The Commission contends that AT&T has not suffered an injury because, "[a]lthough the Commission in the *Order* held that Total lawfully could assess AT&T reasonable terminating access charges for the calls it had completed to the Audiobridge chat-line ... the *Order* did not require AT&T to pay Total anything." The Commission also asserts that any charges Total might seek under the *Order* are time-barred.

AT&T responds that its standing rests upon the collateral estoppel effects of two closely related rulings in the *Order*. AT&T contends that the ruling in the *Order* requiring AT&T to pay Total a "reasonable access charge" will harm it in pending litigation between itself and Total. *Total Telecommunications Services, Inc. v. AT&T Corp.*, Civil Action No. 02–0813 (D.D.C. filed April 29, 2002). First, since July 1996, when Total changed the exchange on which it terminated calls to Audiobridge, AT&T has not been able to block those calls. Total has continued to bill AT&T, and indeed has billed it $2.8 million for calls terminated within the last two years and therefore within the statute of limitations.

Second, AT&T argues that the Commission's dismissal as moot of its counterclaim — in which it alleged that the revenue-sharing arrangement between Total and Audiobridge violated sections 228 and 201(b) of the Act — could be given collateral estoppel effect not only in Total's but also in other like actions pending against AT&T. Specifically, the Commission held that the alleged violation, "standing alone, would not vitiate AT&T's obligation to pay a reasonable access charge for services already provided." Upon this basis the Commission purported to dismiss parts of AT&T's counterclaim "as moot, without prejudice."

With respect to AT&T's first point — that the Commission's ruling on access charges exposes it to liability in litigation — we note the Supreme Court's teaching that "[i]n an appropriate case, appeal may be permitted from an adverse ruling collateral to the judgment on the merits at the behest of the party who has prevailed on the merits, so long as that party retains a stake in the appeal satisfying the requirements of Art. III." *Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S.

326, 334, 100 S.Ct. 1166, 1171–72, 63 L.Ed.2d 427 (1980) (citing *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939)). As we observed recently in *Alabama Municipal Distributors Group v. FERC*, 312 F.3d 470 (D.C.Cir.2002), however, neither the Supreme Court nor this court "has actually found standing on the basis of collateral estoppel." *Id.* at 474. Nonetheless, we think this is "an appropriate case" in which to do so. The Commission issued its *Order* after the district court had referred the case to it pursuant to the doctrine of primary jurisdiction. Although AT&T ultimately prevailed before the Commission on the merits, along the way the Commission determined that AT&T was liable to Total for reasonable access charges and, as it turns out, some of those charges do not appear to be time-barred. Upon the resumption of the litigation, the district court will be bound to follow the *Order*, giving it a preclusive effect more akin to law of the case than to mere collateral estoppel. The *Order* thus injures AT&T and gives it a stake in this appeal sufficient to support its standing to petition for review of the Commission's ruling on its liability for access charges. In addition, since the Total claim is ripe and AT&T's counterclaim is intertwined with that claim, it would make little sense to decline to decide AT&T's claim now.

■ With respect to AT&T's second point — that it is prejudiced by the Commission's having dismissed its counterclaim as moot — we are unable to determine the preclusive effect, if any, of the Commission's ruling. The Commission reasoned that AT&T's counterclaim based upon § 228 was moot because AT&T is obligated in any event to pay reasonable access charges. Nonetheless, the Commission dismissed AT&T's claim against Atlas "as moot, without prejudice." We simply do not know what it means to dismiss a claim "as moot, without prejudice." If a claim is

moot, then it cannot be refiled; if a claim is dismissed without prejudice, then it can be refiled. So which is it? At oral argument counsel for the Commission could not say, and neither can we. Hence, we cannot determine whether the dismissal will have the preclusive effect that would give AT&T standing to seek review of that ruling. We therefore remand the *Order* to the Commission to explain or reform its disposition of AT&T's counterclaim. Consequently, we do not reach AT&T's standing to argue that § 228 bars Atlas and Total from recovering anything from AT&T.

## 2. Access service

■ We now turn to the merits of AT&T's argument with respect to its liability for access service. Before the Commission AT&T argued, among other things, that Total in fact had not provided AT&T with "access service":

> In its tariff [Total] claims to provide "local transport" and "local switching," and it has billed AT&T for purportedly providing those services. Both industry practice and Commission regulation, however, establish that "local transport" consists of the carriage of calls to an end office, and there is clearly no end office behind [Total], only an end user.

Motion of AT&T to Dismiss or for Judgment on the Pleadings at 26. The Commission acknowledges that *it did not consider AT&T's argument in the Order*, but maintains that "[h]aving successfully urged the Commission to pierce the Atlas/Total corporate veil, AT&T should not be heard to complain that the Commission failed to consider whether Total would have provided exchange access if it had not been a creature of Atlas."

We do not understand AT&T to be questioning "whether Total would have provided exchange access if it had not been a

creature of Atlas." AT&T's position is simply that Total did not provide exchange access and therefore AT&T should not have to pay it for that. The Commission may regard AT&T as ungrateful but that is not a reason for failing to address its argument. Yet the *Order* is silent regarding whether any entity — Total or Atlas or the two combined — actually provided access service to AT&T. We therefore remand the *Order* to the Commission to consider AT&T's argument that Total did not provide access service.

### 3. Unreasonable rate claim

AT&T contends that the Commission erred by assuming that, if Total had not existed, then Atlas would have served Audiobridge under the NECA tariff: "no carrier that decides to engage in a chat line revenue sharing scheme would continue participating in the NECA pool," which could mean sharing its revenue with the 1100 other members of the NECA. The Commission argues that AT&T raises this argument for the first time in this court. In order to give the agency an opportunity to pass upon the issue, the Commission maintains that AT&T should have filed a petition for rehearing pursuant to § 405.

AT&T responds that "no claim can be made that [the relevant] evidence was not in the record." And, of course, no such claim is made. But enough of the passive voice: the Commission claims that AT&T did not make the argument, not that the record evidence does not support the argument. The point could not be lost upon AT&T's counsel, which is, no doubt, why the company's half-hearted rejoinder lies buried in a footnote. In any event, we are barred by § 405 from reaching the question whether the Commission erred in assuming Atlas would have adhered to the NECA tariff.

### III. Conclusion

We deny Atlas/Total's petition for review. We grant in part AT&T's petition for review and remand the *Order* to the Commission (1) to clarify its disposition of AT&T's counterclaim, which it dismissed "as moot, without prejudice," and (2) to respond to AT&T's argument that Total did not provide it with access service.

*So ordered.*