Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 16, 2009          Decided January 26, 2010

No. 09-1029

PNGTS SHIPPERS' GROUP, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PORTLAND NATURAL GAS TRANSMISSION SYSTEM,
INTERVENOR

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*John B. Rudolph* argued the cause for petitioners. With him on the briefs was *Timothy W. Bergin*.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Thomas R. Sheets*, General Counsel, *Robert H. Solomon*, Solicitor, and *Kathrine L. Henry*, Attorney.

*Carl M. Fink*, *Mark F. Sundback*, *Kenneth L. Wiseman*, *Jennifer L. Spina*, and *Lisa M. Purdy* were on the brief for intervenor in support of respondent.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Shippers with long-term (twenty-year) firm contracts on the Portland Natural Gas Transmission System ("PNGTS") petition for review of two orders of the Federal Energy Regulatory Commission ("FERC") certifying PNGTS's capacity. The Shippers' Group contends FERC's determination was arbitrary and capricious because FERC failed to take into account the potential economic impact of a reduction in capacity. Noting the pipeline's historical capacity and an "at-risk" condition imposed by FERC on PNGTS, the shippers fear that their rates will increase as a result of the reduction. In the challenged orders, however, FERC concluded that any potential impact on rates would be better addressed in PNGTS's subsequent rate case. *Portland Natural Gas Transmission Sys.*, 123 F.E.R.C. ¶ 61,275 (June 19, 2008) ("*Declaratory Order*"), *reh'g denied*, 125 F.E.R.C. ¶ 61,198 (Nov. 18, 2008) ("*Rehearing Order*"). Because the shippers cannot show an actual or imminent injury as a result of the challenged orders, they are not aggrieved pursuant to section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). Accordingly, the court lacks jurisdiction and the petition for review must be dismissed.

**I.**

The Natural Gas Act provides that pipelines must obtain a certificate of public convenience and necessity before they can construct, acquire, or operate interstate natural gas pipeline facilities. 15 U.S.C. § 717f(c). Facilities subject to FERC's

jurisdiction or services rendered by such facilities may not be abandoned without FERC's prior approval, based on a finding that the available supply of natural gas is depleted or that the present or future public convenience and necessity permit abandonment. § 717f(b); *see* 18 C.F.R. §§ 157.1–.22 (Part 157, Subpart A). A pipeline, however, may file a petition for a declaratory order "to terminate a controversy or remove uncertainty." 18 C.F.R. § 385.207(a)(2). PNGTS filed such a petition in 2008 in view of several orders by FERC addressing the construction of two pipelines.

In the *Declaratory Order* now challenged by the Shippers' Group, FERC summarized the background to its decision. In July 1996 FERC issued preliminary determinations in two proceedings in which PNGTS and Maritimes & Northeastern Pipeline, LLC ("Maritimes") sought authorization to construct pipeline facilities in the Northeastern United States. *Declaratory Order* ¶ 3. Because the southern portion of each proposed pipeline "would run along essentially the same route, [FERC] urged the pipelines to consider jointly owning pipeline where their proposed routes converged." *Id.* They did and subsequently they filed an additional application to construct jointly a 101-mile long, thirty-inch diameter pipeline extending from Westbrook, Maine, to Dracut, Massachusetts, as well as various laterals ("joint facilities").

In July 1997 FERC made a preliminary determination, pending favorable environmental review, authorizing PNGTS to construct and operate an individually owned 142-mile long, 24-inch diameter pipeline from the Canadian border near Pittsburg, New Hampshire to Westbrook, Maine, as well as facilities jointly owned with Maritimes from Westbrook, Maine to Wells, Maine. At the border, PNGTS's facilities would interconnect with facilities of TransQuebec & Maritimes Pipeline, Inc. ("TQM"). FERC also made a preliminary determination to

authorize PNGTS to provide service using its capacity on the joint facilities from Wells, Maine and Dracut, Massachusetts, and to construct and operate the remaining joint facilities from Wells, Maine to Westbrook, Maine. FERC found:

> In the first year of service, PNGTS will have a capacity of 178,000 Mcf [one thousand cubic feet] per day on its 24-inch mainline and . . . 169,400 Mcf per day on the joint facilities. In subsequent years, the upstream mainline and PNGTS' share of the joint facilities' capacity will increase to 210,000 Mcf per day. Therefore, PNGTS must revise its initial rates to reflect billing determinants based on [these capacities].

*Id*. ¶ 5 (quoting *Portland Natural Gas Transmission Sys*., 80 F.E.R.C. ¶ 61,134 at 61,448 (1997)). The preliminary determination "also noted that PNGTS had not entered into contracts for the full capacity of its system and placed PNGTS at risk for the recovery of the costs for the unsubscribed capacity." *Declaratory Order* ¶ 5. The increased capacity after the first year of service would result from installation of additional compression by TQM on its Canadian facilities to accommodate Maritimes's proposal to construct upstream facilities to be placed in service after a year. FERC conditioned PNGTS's certificate authorization on TQM receiving the necessary approvals.

In September 1997 FERC issued final certificates to PNGTS authorizing construction and operation of the individually-owned pipeline facilities between Pittsburg, New Hampshire and Westbrook, Maine, as well as construction and operation of the joint facilities between Westbrook and Wells, and the operation of the joint facilities between Wells and Dracut. The 1997 final certificate order also addressed PNGTS's petition for rehearing on the issue of the increase in

capacity and the at-risk condition after the first year. Because it was uncertain exactly when the Maritimes upstream facilities would go on line and when TQM would install its new planned compression, FERC concluded it was "premature to require PNGTS to revise its rates or to be placed at risk for higher capacity after its first year of operation," *Declaratory Order* ¶ 8 (quoting *Portland Natural Gas Transmission Sys.*, 80 F.E.R.C. ¶ 61,345 at 62,146 (1997)), and stated it would "review this matter when PNGTS makes its section 4 [rate] filing," *id.* In December 2006 PNGTS and Maritimes filed a settlement resolving various issues involving the joint facilities, which FERC approved in part in March 2007.

On January 31, 2008, PNGTS filed a petition for a declaratory order requesting a determination that physical capacity across its system would be 168,000 Mcf per day on a firm year-round basis once Maritimes Phase IV Expansion facilities were placed in service on November 1, 2008. It also requested a determination that it could lawfully deny future requests for firm service that together with its existing contracts would cause it to exceed 168,000 Mcf per day. According to FERC, the 1997 final certificate orders did not establish a certificated firm level of service and PNGTS's most recent section 4 rate case had resulted in a settlement without resolving that issue. PNGTS explained that its previously available capacity would diminish when Maritimes's Phase IV Expansion facilities were placed in service. Because there was no contractual basis for obligating TQM to construct more compression upstream, the increased pressure downstream would reduce PNGTS's capacity. PNGTS also requested that the rate consequences of its petition be addressed in its subsequent section 4 filing.

In the *Declaratory Order* granting PNGTS's petition, FERC made four determinations. *First*, FERC concluded that PNGTS

was not required to file an abandonment application because (A) the 1997 final certificate order authorizing PNGTS's facilities did not establish a system-wide certificated capacity level after the first year of service, due to the uncertainty involving the timing and impact of additional compression and use of joint facilities, and (B) PNGTS's subsequent rate case was resolved by uncontested settlement, which also did not establish a certificated capacity for PNGTS. *Second*, FERC concluded that it was appropriate to determine PNGTS's certificated level of service going forward because that would "remove uncertainty and provide transparency to the market," including PNGTS and its shippers. *Id.* ¶ 27. *Third*, upon reviewing the engineering information submitted by PNGTS, FERC found that adopting 168,000 Mcf per day as PNGTS's annual certificated system-wide capacity was in the public convenience and necessity. Although "PNGTS historically has been able to provide service in excess of this level," FERC stated its "primary focus is whether natural gas service will be jeopardized." *Id*. ¶ 29. It found "no basis to conclude that requiring PNGTS to operate its system at a capacity level greater than 168,000 is needed to continue to serve current or anticipated customers." *Id.*[1] No party, FERC noted, took issue with PNGTS's assertions that it will have more than sufficient capacity to meet all of its "contractual obligations for service after October 31, 2008, that are now in effect, and that it is not aware of any interest for additional firm service that would exceed the 168,000 Mcf/d capacity level." *Id. Fourth*, FERC stated that the "action here

---

[1] In footnote 30 of the *Declaratory Order*, FERC stated that its finding PNGTS will be incapable of transporting volumes in excess of 168,000 Mcf on a firm year-round basis from Pittsburg to Dracut after the in-service date of Maritimes' Phase IV Expansion "does not . . . affect PNGTS's capacity rights of 210,000 Mcf/d in the joint facilities between Westbrook and Dracut as defined by the Definitive Agreements between PNGTS and Maritimes." *Id.* ¶ 28 n.30.

does not prejudge the impact of our decision on PNGTS's rates and . . . any rate issues associated with our decision here, including the appropriate determinants to use to design PNGTS's rates, are more appropriately determined in PNGTS's next rate proceeding." *Id*. ¶ 30.

On rehearing, FERC rejected the objections presented by the Shippers' Group, including that PNGTS was required to file for abandonment. FERC explained that an abandonment proceeding was not required because it had deferred the determination of future capacity to PNGTS's subsequent rate case and the issue of capacity had never been resolved in view of the settlement of that rate case. *Rehearing Order* ¶ 16. Further, FERC explained that the record did not support requiring PNGTS to maintain its system design at a higher level, *id*. ¶ 19, and that there was no reason to inquire whether PNGTS could contract for additional existing compression from its affiliates, or whether cheap compression could be built, because there were no pending requests for additional firm service, *id*. ¶ 18. Rejecting the Shippers' Group's assertion that FERC had ignored the rate impact on the shippers, FERC stated the *Declaratory Order*

> specifically limited our ruling to the certificated capacity of the PNGTS system . . . [and] did not prejudge the impact of PNGTS' rates and any rate issues, including the appropriate determinants to use to design PNGTS' rates . . . . Similarly, the [*Declaratory Order*] did not address or change the at-risk condition imposed on PNGTS by the Commission's certificate orders. The at-risk condition relates to the design of PNGTS' rates and is more appropriately addressed in PNGTS' next rate case.

*Id*. ¶ 20. The Shippers' Group petitions for review of the *Declaratory Order* and the *Rehearing Order*.

## II.

Ordinarily when a pipeline seeks to reduce its certificated level of capacity it must seek prior approval of the abandonment of capacity pursuant to the Natural Gas Act. 15 U.S.C. § 717f(b); *see* 18 C.F.R. § 157.5; *see also Tenn. Gas Pipeline Co. v. FERC,* 972 F.2d 376, 384 (D.C. Cir. 1992). The Shippers' Group contends that FERC failed to provide an adequate explanation of why PNGTS's capacity reduction does not constitute an abandonment. In seeking rehearing, they had argued that the 1997 final certificate order did not reduce PNGTS's liability for a capacity of 210,000 Mcf per day under the at-risk condition. Now, referencing footnote 30 of the *Declaratory Order*, *supra* note 1, the shippers express concern that they will be liable for the contractually determined 210,000 Mcf per day portion of the costs of the jointly owned facilities without any corresponding benefit. In their view, FERC had a statutory duty to consider circumstances such as rates and the potential for future obligations on shippers, rather than deciding certificated capacity based on whether service to current shippers would be jeopardized. They further contend that because PNGTS and TQM are affiliated with the same operator, FERC erroneously took into account incapability to provide certificated capacity when that was not a result of physical incapability but an operational choice by PNGTS.

As a threshold matter, however, FERC maintains that the Shippers' Group lacks standing because it cannot show concrete and particularized harm as a result of the *Declaratory Order* and the *Rehearing Order*. Because those orders were limited to establishing PNGTS's certificated capacity, and did not prejudge the impact of FERC's decision on any rate issues, including the

appropriate billing determinants and the at-risk condition previously imposed on PNGTS, FERC concludes that the Shippers' Group is not aggrieved and the court lacks jurisdiction over its claims.

Section 19(b) of the Natural Gas Act allows only "aggrieved" persons to seek judicial review of a FERC order. 15 U.S.C. § 717r(b); *see Interstate Natural Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 45 (D.C. Cir. 2002). A party is aggrieved only "if it can establish both the constitutional and prudential requirements for standing." *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1219 (D.C. Cir. 2009) (quoting *Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 613 (D.C. Cir. 2001)). A petitioner must "establish, at a minimum, 'injury in fact' to a protected interest." *Interstate Natural Gas Ass'n*, 285 F.3d at 45 (quoting *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1200 (D.C. Cir. 1995)). "Injury in fact" requires harm that is both "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–61 (1992); *N.C. Util. Comm'n v. FERC*, 653 F.2d 655, 662 (D.C. Cir. 1981). The petitioner also must show there is "a causal connection between the injury and the conduct complained of – the injury must be fairly . . . traceable to the challenged action of the [respondent]." *Lujan*, 504 U.S. at 560–61. The burden is on the petitioner to show "the specifics of the aggrievement alleged." *N.C. Util. Comm'n*, 653 F.2d at 663. The Shippers' Group has not met its burden.

Each member of the Shippers' Group has a long-term firm transportation agreement with PNGTS that obligates the shipper to pay PNGTS's firm transportation rates. Before FERC the Shipper's Group argued that its members would be "directly affected by any ruling which could impact PNGTS' cost responsibilities imposed by the orders issued during its system certification." Motion to Intervene and Protest of the PNGTS

Shippers' Group ("*Shippers' Protest*") at 4. It notes that PNGTS's rates are calculated under an at-risk condition by apportioning system costs according to billing determinants, factors based on the total system costs and the total capacity of the pipeline. *Id.* at 10–11; *see also Declaratory Order* ¶¶ 5, 26; *Rehearing Order* ¶¶ 11, 16. The shippers' concern is that by setting PNGTS's certificated capacity at a level at least 20% below that recognized in the 1997 preliminary certificate order, without a corresponding reduction in system costs or facilities, the shippers' costs may increase if the billing determinants are based on the certificated capacity. Reducing capacity under an at-risk condition reduces PNGTS's incentive to pay for system costs by seeking contracts for interruptible service rather than by shifting costs to shippers with long-term firm service contracts; it also will relieve PNGTS of the burden of having to obtain extra compression facilities. The Shippers' Group therefore maintains that "FERC has set the stage for capacity-based billing determinants that could increase rates by over 22%, an increase that is not merely speculative but readily quantifiable." Pet'r's Br. 29. In its view, the challenged orders "undermine any likelihood that PNGTS' original at-risk condition will govern its rates and provide the same shipper protections in the future, and accordingly inhibit negotiation of long-term contract and rate issues, forcing further administrative litigation." *Id.*

The potential for "future economic injury," even assuming it is "readily quantifiable" into a possible rate increase in the future, *id.*, is not enough to show the requisite injury for Article III standing. The Shippers' Group does not contend that this rate increase is inevitable once FERC established PNGTS's certificated capacity below the capacity stated in the 1997 final certificate order. FERC has not yet determined PNGTS's rates at its certificated capacity level and FERC has stated that it will determine the rates in PNGTS's section 4 rate proceeding. *See Declaratory Order* ¶ 30; *Rehearing Order* ¶ 20. Neither did

FERC "address or change the at-risk condition." *Rehearing Order* ¶ 20.

In *Alabama Municipal Distributors Group v. FERC*, 312 F.3d 470, 473 (D.C. Cir. 2002), the court held that even where FERC had approved the initial rates for a new customer as part of a certification order, other gas purchasers did not have standing to challenge the certification because their rates would not be determined until the pipeline had adopted new rates reflecting the new service in a section 4 rate proceeding. Similarly, in *North Carolina Utilities Commission*, 653 F.2d at 662–63, the court held that the projected use of an order in future compensation proceedings did not constitute aggrievement by that order. Instead, if the order did aggrieve the North Carolina Utilities Commission in later proceedings, the court explained that the order could be challenged both in the later FERC proceedings and on appeal from those proceedings. *Id.* at 662, 665. So too here.

In the challenged orders FERC stated it was deferring any decisions on PNGTS's rates and billing determinants to a subsequent section 4 rate proceeding. The Shippers' Group suggests that FERC's determination of reduced capacity cannot be "without prejudice" to future ratemaking absent assurances to shippers that PNGTS will not rely on the *Declaratory Order* in a later rate proceeding. But at this point FERC has yet to indicate how or whether PNGTS's certificated capacity will affect the shippers' rates in view of the at-risk condition. FERC proposes to address the matter in PNGTS's subsequent section 4 rate proceeding. The Shippers' Group presents no persuasive reason why the shippers' interests cannot be adequately addressed in this manner.

An abandonment proceeding is a forum in which FERC should consider the potential economic impact of a capacity

reduction, *see Transcon. Gas Pipe Line Corp. v. FPC*, 488 F.2d 1325, 1330 (D.C. Cir. 1973); 18 C.F.R. § 157.18, and the Shippers' Group contends there was a capacity reduction for PNGTS that FERC should have adjudicated in an abandonment proceeding. It maintains that the upcoming section 4 rate proceeding will "inevitably confront[]" questions such as "what is the precise rate impact of an approved capacity reduction?" and "do rates based on billing determinants above levels a pipeline is 'incapable' of delivering satisfy due process?" that already assume a reduction in capacity. Pet'r's Br. 31. However, being forced to confront questions in a future legal proceeding does not rise to the level of injury required for Article III standing. *Shell Oil,* 47 F.3d at 1202; *see also Ala. Mun. Distribs. Group*, 312 F.3d at 473–74. Those questions indicate a conceivable but not imminent effect on shippers' rates. *See Shell Oil*, 47 F.3d at 1202. Even were it clear, as the Shippers' Group suggests, that PNGTS would argue in the rate proceeding that retaining the same billing determinants would violate its right to due process, how FERC would respond and what the resulting effect on shippers' rates would be are both speculative. The Shippers' Group can present its challenges to FERC's failure to require PNGTS to file an application for abandonment if and when it petitions for review of the rates established in the section 4 proceeding. *See also N.C. Util. Comm'n,* 653 F.2d at 665.

Reliance on *ANR Pipeline Co. v. FERC*, 771 F.2d 507 (D.C. Cir. 1985), does not assist the Shippers' Group. In that case, the costs had been allocated to the pipeline, rather than leaving that allocation for a later section 4 rate proceeding, *id*. at 511, making it "unavoidable" that the pipeline's rates would increase and the pipeline would be bound in a later rate proceeding by FERC's cost allocation, *id*. at 515–16. Here, costs have yet to be allocated so as to require a rate increase, and the Shippers' Group has not claimed a rate increase for its members is

"unavoidable" under the challenged orders. *Great Lakes Gas Transmission Co. v. FERC*, 984 F.2d 426, 431 (D.C. Cir. 1993), on which the Shippers' Group also relies, is likewise unhelpful. There the court concluded that imposition of an at-risk condition on the pipeline was immediately appealable by the pipeline because the condition affected the pipeline's "long-range economic planning." Here, FERC stated it had neither addressed nor changed the at-risk condition in establishing PNGTS's certificated capacity. *See Rehearing Order* ¶ 20. The Shippers' Group's projection of potential harm from the challenged orders in a subsequent rate proceeding is one step removed from the injury in *Great Lakes*. The capacity certification in and of itself does not create the requisite injury to shippers.

Accordingly, because the Shippers' Group fails to demonstrate that shippers are aggrieved by the challenged orders, the court lacks jurisdiction to address its claims and the petition must be dismissed.