# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 19, 2022

Lyle W. Cayce
Clerk

No. 21-60017
CONSOLIDATED WITH
No. 21-60200

GULFPORT ENERGY CORPORATION,

*Petitioner*,

*versus*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent*.

Petitions for Review of Orders of
the Federal Energy Regulatory Commission
Nos. RP20-1204, RP20-1236,
RP20-1206, RP20-1233

Before DAVIS, SMITH, and ENGELHARDT, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

The Bankruptcy Code allows debtors to breach and cease performing executory contracts if the bankruptcy court approves. We thus have held that debtors may "reject" regulated energy contracts even if the Federal Energy Regulatory Commission ("FERC") would not like them to. *Off. Comm. of Unsecured Creditors of Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.*), 378 F.3d 511, 515 (5th Cir. 2004). A sister circuit agrees, *FERC v.*

No. 21-60017
No. 21-60200

*FirstEnergy Sols. Corp.* (*In re FirstEnergy Sols., Corp.*), 945 F.3d 431, 446 (6th Cir. 2019), and we confirmed our view mere months ago, *FERC v. Ultra Res., Inc.* (*In re Ultra Petroleum Corp.*), 28 F.4th 629, 634 (5th Cir. 2022).

Nevertheless, FERC persisted. Anticipating the petitioner's insolvency, FERC issued four orders purporting to bind the petitioner to continue performing its gas transit contracts even if it rejected them during bankruptcy. The petitioner asks us to vacate those orders. Because FERC cannot countermand a debtor's bankruptcy-law rights or the bankruptcy court's powers, we grant the petitions for review and vacate the orders.

## I.

We start with legal background. We then turn to the facts. After addressing the facts developed in the agency proceedings, we review the history of Gulfport's bankruptcy, which began after FERC issued the subject orders.

## A.

The parties dispute how two legal regimes—the Bankruptcy Code and the Natural Gas Act—interact. But their dispute is narrow. The question is how a bankrupt debtor's power to reject executory contracts interacts with FERC's power to decide whether a party may change or cancel filed-rate contracts, which the agency regulates. To answer that question, we must review what rejection does and then explain how it relates to the Natural Gas Act.

The Bankruptcy Code empowers debtors, "subject to the court's approval," to "assume or reject any executory contract." 11 U.S.C. § 365(a).[1] That means that a debtor may choose either to perform (assume) or "breach" (reject), § 365(g), any contract "that neither party has finished performing,"

---

[1] Technically, the Code vests that power in "the trustee," 11 U.S.C. § 365(a), but a reorganizing "debtor in possession" has "all the . . . powers . . . of a trustee," § 1107.

No. 21-60017
No. 21-60200

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1657 (2019).

That tool might seem unhelpful. Breaching a contract does not erase that contract; it entitles the contract's counterparty to seek damages for the debtor's nonperformance. *Id.* at 1658. But here's the rub: Most debtors are broke and cannot pay in full that damages claim. *Ibid.* So "in a typical bankruptcy," the counterparty to a rejected contract "may receive only cents on the dollar" for its claim against the debtor, yet the debtor will retain the benefit of having ceased performance. *Ibid.* In that way, "rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." *Ultra*, 28 F.4th at 636 (quoting *Mirant*, 378 F.3d at 517).

The Natural Gas Act ("NGA") regulates firms that move and sell natural gas in interstate commerce. 15 U.S.C. § 717(a). When those firms contract to move or sell gas, they must file the rates they charge with FERC. § 717c(c). The NGA conditions any change to those filed rates on FERC's approval. § 717c(d), (e); *see also* § 717d(a). The Federal Power Act ("FPA") imposes materially identical requirements on power companies.[2]

About two decades ago, FERC tried to assert its rate-setting authority under the FPA to block Mirant, a power company, from rejecting filed-rate contracts in bankruptcy. *Mirant*, 378 F.3d at 514–15. Because the FPA says a power company cannot "modify" or "abrogate" its rates without FERC's approval, FERC declared that Mirant needed its permission to reject any filed-rate contract. *Id.* at 519.

This court disagreed. *Id.* at 515. We explained that FERC had misconstrued the effect of rejection. Rejection does not change or cancel a

---

[2] *Compare* § 717d(a), *with* 16 U.S.C. § 824e(a); *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981) (the FPA and NGA "are in all material respects substantially identical" (quoting *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956)).

contract; it *breaches* that contract, *id.* at 519, giving the debtor's counterparty a damages claim for the value of the debtor's continued performance, *id.* at 520. The contract itself does not change; nor does the filed rate. No change is wrought where the counterparty's claim for damages is "calculated using the filed rate," *id.* at 519, even if the debtor cannot pay that claim in full, *id.* at 521. Thus, the panel concluded, Mirant did not need FERC's consent to reject its filed-rate contracts, and FERC could not "negat[e]" a rejection by requiring Mirant to continue performance. *Id.* at 523.

At first, FERC acknowledged *Mirant*.[3] But three years ago, FERC decided that *Mirant* need not be followed. FERC declared that Pacific Gas & Electric would need its approval before rejecting its filed-rate power purchase agreements in bankruptcy.[4] FERC did the same in other cases, including *ETC Tiger Pipeline, LLC*, 171 FERC ¶ 61,248, at ¶ 20, *reh'g denied*, 172 FERC ¶ 61,155 (2020), which addressed contracts filed per the NGA, like the gas transit contracts in this case.

FERC's decrees pressed the rationale that *Mirant* repudiated: namely, that rejection "modif[ies] or abrogate[s]" a filed-rate contract. *ETC Tiger*, 172 FERC ¶ 61,155, at ¶ 4. To justify that position, FERC claimed that the effect of rejection on filed-rate contracts is legally "unsettled," citing a 2006 district-court opinion from New York[5] and, curiously, *Mission Product*

---

[3] *See Cal. Elec. Oversight Bd. ex rel. Lockyer v. Calpine Energy Servs., L.P.*, 114 FERC ¶ 61,003, at ¶ 11 (2006) ("[*Mirant*] has now spoken to the issue . . . and we intend to follow that authority. Under [*Mirant*], the Commission is precluded from taking action under the FPA that impacts a debtor's ability to reject an executory contract.").

[4] *Exelon Corp. v. Pac. Gas & Elec. Co.*, 166 FERC ¶ 61,053, at ¶ 28 (2019), *vacated as moot sub nom. NextEra Energy, Inc. v. Pac. Gas & Elec. Co.*, 177 FERC ¶ 61,162 (2021).

[5] *Cal. Dep't of Water Res. v. Calpine Corp.* (*In re Calpine Corp.*), 337 B.R. 27 (S.D.N.Y. 2006).

No. 21-60017
No. 21-60200

*Holdings, Inc. v. Tempnology, LLC*,[6] in which the Supreme Court confirmed that "rejection is breach and has only its consequences."[7] FERC offers the same reasons to justify the orders before this court.

B.

Our petitioner, Gulfport Energy Corporation, produces natural gas. Through transportation service agreements ("TSAs"), Rover Pipeline, who intervened in this appeal, agreed to transport Gulfport's gas through its pipelines. The TSAs are executory contracts. They establish the "maximum daily quantity" of gas that Gulfport may push through Rover's pipelines, as well as the rates Rover may charge for that service.

The COVID-19 pandemic crushed demand for energy and, with it, the price of oil and natural gas. That shock strangled many energy producers, including Gulfport. By summer 2020, Gulfport's financial outlook was grim: In its quarterly financial filing, Gulfport warned that decreased commodity prices "ha[d] significantly impaired the Company's ability to access capital markets and to refinance its existing indebtedness." Gulfport's management doubted "the Company's ability to continue as a going concern."

That revelation worried Rover. If Gulfport failed, it might reject the TSAs and, being insolvent, pay Rover cents on the dollar for its due under those contracts. Preferring to get paid in full for moving Gulfport's gas, Rover petitioned FERC. Rover asked FERC to announce that it had exclusive jurisdiction over the TSAs, so that Gulfport would have to get FERC's approval before rejecting those contracts in bankruptcy. Rover also asked the

---

[6] *See, e.g.*, *ETC Tiger*, 172 FERC ¶ 61,155, at ¶¶ 23–29 (citing *Calpine* and *Mission Product*).

[7] 139 S. Ct. at 1663 (cleaned up); *see also, e.g.*, *Mirant*, 378 F.3d at 519 ("Under the Bankruptcy Code . . . , Mirant's *rejection* . . . is a *breach* . . . .").

agency to hold an expedited paper hearing to determine whether continued performance of the TSAs would harm the public interest.

In two orders, FERC gave Rover everything it wanted.

FERC first granted Rover's petition for a declaratory order. After noting that the TSAs are filed-rate contracts, FERC asserted "parallel, exclusive jurisdiction" over them. It then declared, contrary to *Mirant*, that "rejection" of a filed-rate contract "in bankruptcy court alters the essential terms and conditions" of that contract. And because "the Commission's approval is required to modify or abrogate [a] filed rate," FERC continued, Gulfport would need FERC's approval before rejecting any TSA during bankruptcy. FERC also stated that the bankruptcy court could not confirm any reorganization plan that rejected a TSA "unless and until the Commission agrees, or the plan . . . is made contingent on Commission approval." And FERC agreed to hold an expedited paper hearing "to determine whether the public interest presently requires that th[e] [TSAs'] filed rates should be abrogated or modified."

A month later, after a flurry of filings, FERC issued an order in the promised paper hearing. FERC found "that the public interest does not presently require the modification or abrogation of the Gulfport TSAs," because the rates "currently on file and in effect remain just and reasonable" under the *Mobile–Sierra* standard.[8] Again asserting exclusive jurisdiction to allow

---

[8] The *Mobile–Sierra* standard comes from *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348 (1956), and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956). The standard requires FERC to "presume that a rate set by 'a freely negotiated wholesale-energy contract' meets the statutory 'just and reasonable' requirement." *NRG Power Mktg., LLC v. Maine Pub. Util. Comm'n*, 558 U.S. 165, 167 (2010) (citation omitted). That presumption "may be overcome only if FERC concludes that the contract seriously harms the public interest." *Ibid.* (citation omitted). To that inquiry, several considerations are relevant, including whether the filed rate "might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly

No. 21-60017
No. 21-60200

rejection of filed-rate contracts, FERC purported to require Gulfport to continue performing the TSAs.

FERC then denied rehearing of the first order. The next day, Gulfport filed for bankruptcy and moved the bankruptcy court to allow it to reject the TSAs.[9] Two months later, FERC denied rehearing of the second order. Gulfport timely petitioned this court for review[10] of both orders and the denials of rehearing.[11] We review those four orders here.

## C.

While awaiting our decision on its petitions, Gulfport continued trying to reject the TSAs in its bankruptcy proceedings. But Rover objected that the bankruptcy court "lacked exclusive subject matter jurisdiction over [Gulfport's] rejection request" because FERC had already asserted jurisdiction. Rover also moved to "withdraw the reference"—in other words, to push its objection to the *district* court for initial decision.[12]

In an emphatic order, the bankruptcy judge urged the district court to

---

discriminatory." *Sierra Pacific*, 350 U.S. at 355.

[9] *In re Gulfport Energy Corp.*, No. 20-35562 (Bankr. S.D. Tex. filed Nov. 15, 2020), ECF No. 59.

[10] *See* 15 U.S.C. § 717r(b) (requiring a petitioner to seek review of a FERC order "within sixty days after the order of the Commission upon the application for rehearing"). Gulfport may petition this court because Rover, "the natural-gas company to which the order[s] relate[,] is located or has its principal place of business" in this circuit. 15 U.S.C. § 717r(b).

[11] Gulfport also sought review of similar orders that FERC had granted for other pipeline companies, including TC Energy, but those petitions have been dismissed.

[12] *See* 28 U.S.C. § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section . . . , for cause shown. The district court shall . . . so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both [the Bankruptcy Code] and other laws of the United States regulating . . . interstate commerce.").

deny Rover's motion to withdraw the reference. The bankruptcy court blasted Rover for "obtaining an advisory order from FERC" to obstruct and "avoid the Court's proper exercise of its jurisdiction over [the] pure bankruptcy matter" of rejection. "Th[at] tactic and associated arguments," the bankruptcy judge continued, "have been repeatedly rejected and are contrary to established Fifth Circuit precedent."

The bankruptcy judge issued his recommendation in January 2021 and asked the district court to consider it quickly. The district court promptly withdrew the reference. The bankruptcy court then confirmed Gulfport's reorganization plan, subject to the ruling on Rover's objections.

Then *Ultra*, 28 F.4th 629 (5th Cir. 2022), reaffirmed our position in *Mirant*. *Ultra*'s facts are nearly the same as ours: An energy company, Ultra, filed for bankruptcy and moved to reject its NGA filed-rate contracts with REX, a pipeline company. REX and FERC objected to the bankruptcy court's jurisdiction on the ground that FERC had not approved rejection.

Declaring the jurisdictional question "settled," this court affirmed the bankruptcy court. *Id.* at 639. Under *Mirant*, we explained, "a bankruptcy court can authorize rejection of a filed-rate contract and, post-rejection, FERC cannot require continued performance on the rejected contract." *Ibid.* (cleaned up). We observed that accepting FERC's position would create a circuit split. *Id.* at 641 (citing *FirstEnergy*, 945 F.3d at 451). And we rejected FERC's claim that only "full proceedings before the Commission" could satisfy the bankruptcy court's duty to solicit FERC's views before approving rejection. *Id.* at 642–43. We also reiterated that rejection, being just a breach, does not change or cancel a filed-rate contract. *Id.* at 643.

After *Ultra* came two relevant developments. *First*, the agency now claims, for the first time, that Gulfport's petitions for review are nonjusticiable. Either *Ultra* moots Gulfport's petition for review, FERC says, or Gulf-

port lacks standing to challenge the agency's orders. *Second*, on July 13, the district court dismissed Rover's objections and returned Gulfport's rejection motions to the bankruptcy court.[13]  Applying *Ultra* and *Mirant*, the district court stated that "the bankruptcy court has authority to reject [Gulfport's] agreement[s] with Rover without conflicting with FERC's authority to regulate filed rates."  The court then instructed the bankruptcy court "to calculate damages resulting from [Gulfport's] breach of contract using the filed rates."

## II.

Gulfport challenges FERC's orders on two grounds.  The first is that FERC lacked statutory authority to issue them.  The second is that the orders are unlawful.  But before we reach those questions, we must decide whether Gulfport's challenge is justiciable, and we conclude that it is.  The challenge is neither unripe nor moot, and Gulfport has standing.

## A.

Jurisdiction comes first,[14] and we review it *de novo*.[15]

We first note that Congress has authorized us to review FERC orders. The Administrative Procedure Act empowers this court to review "[a]gency action made reviewable by statute."  5 U.S.C. § 704.  And "[u]pon the filing of [a] petition" for review, the NGA gives this court "jurisdiction . . . to affirm, modify, or set aside" FERC orders, 15 U.S.C. § 717r(b), so long as the petitioner sought rehearing before the Commission and is a "party" whom the orders "aggrieve[ ]," § 717r(a).  Gulfport timely petitioned for review of

---

[13] *In re Gulfport Energy Corp.*, No. 4:21-cv-232 (S.D. Tex. Jul. 13, 2022), ECF No. 36.

[14] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).

[15] *Edge Petroleum Operating Co. v. GPR Holdings, LLC* (*In re TXNB Internal Case*), 483 F.3d 292, 298 (5th Cir. 2007).

No. 21-60017
No. 21-60200

all four orders.  But we still must decide whether those orders "aggrieved" Gulfport.  *Ibid.*  Though that requisite implicates the doctrines of standing and ripeness, *see Brooklyn Union Gas v. FERC*, 190 F.3d 369, 373–74 (5th Cir. 1999), we start with standing.

The aggrievement requisite all but duplicates the traditional requisites for Article III standing.[16]  A party is not "'aggrieved' by a FERC decision unless its injury is 'present and immediate.'"  *Brooklyn Union Gas*, 190 F.3d at 373 (citation omitted).  The order must "definitively" affect the petitioner's rights and "threaten the petitioner with irreparable harm," *ibid.* (cleaned up), which is harm that "cannot be altered by subsequent administrative action," *Energy Transfer Partners, L.P. v. FERC*, 567 F.3d 134, 139 (5th Cir. 2009) (citation omitted).  Aggrieving orders thus include those that "command the petitioner to do or refrain from doing something," "significantly change the petitioner's status or condition to his detriment, or presently deprive him of his property." *Tenneco, Inc. v. FERC*, 688 F.2d 1018, 1021 (5th Cir. 1982) (cleaned up).  They also include orders that "impos[e] . . . a Hobson's choice" by threat of "criminal and civil penalties." *Pennzoil Co. v. FERC*, 645 F.2d 394, 400 (5th Cir. May 1981).  But mere delay or inconvenience from having to endure or await further proceedings generally does not aggrieve a party. *See, e.g.*, *id.* at 399–400; *Tenneco*, 688 F.2d at 1022–23.

Gulfport contends that it is "undeniably 'aggrieved'" in three ways. *First*, Gulfport has had to "defend itself" in the bankruptcy proceedings from Rover's contentions that FERC's orders prevent the court from authorizing

---

[16] *PNGTS Shippers' Grp. v. FERC*, 592 F.3d 132, 136–39 (D.C. Cir. 2010) ("A party is aggrieved [per § 717r] only if it can establish . . . constitutional . . . standing." (citation omitted)); *see also, e.g.*, *Kan. City S. Indus., Inc. v. ICC*, 902 F.2d 423, 429 (5th Cir. 1990) (applying the traditional Article III analysis to the aggrievement requirement in 28 U.S.C. § 2344, which generally governs review of agency orders).

rejection of the TSAs.  Gulfport stresses that Rover presented FERC's orders to that court as "'binding' and 'entitled to preclusive effect,' thereby prohibiting Gulfport from rejecting the TSAs and finalizing its restructuring."  *Second*, Gulfport says that it has had to defend itself from orders and proceedings that FERC did not have the power to impose.  *Third*, Gulfport protests the threatened legal consequences of FERC's orders—namely, the denial of its bankruptcy-law right to reject its contracts.

The first injury does not suffice.  Gulfport complains that it has had to confront Rover's references to FERC's orders during its bankruptcy proceeding, but "being forced to confront questions in a future legal proceeding does not rise to the level of injury required for Article III standing."[17]  Even if that injury could support standing, Gulfport has not shown that "it would be unable to attack the basis of any adverse finding in th[e bankruptcy] proceeding."  *N.C. Util. Comm'n*, 653 F.2d at 662.  As *Ultra* shows, Rover did not need an order from FERC to try blocking Gulfport from rejecting the TSAs.[18]  So it is not clear that any injury from sparring with Rover at the bankruptcy court is "fairly traceable" to FERC, as standing requires.  *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quotation and citation omitted).

A similar problem afflicts the second injury.  Gulfport frames that injury as the *cost* of the proceedings that FERC has imposed—the "time and resources" Gulfport has expended to "defend itself" in unlawful agency proceedings.  That injury is traceable to FERC's orders.  Yet time and again, the

---

[17] *PNGTS Shippers*, 592 F.3d at 138; *see also Energy Transfer Partners*, 567 F.3d at 141 ("[C]oncern about expected litigation expenses does not constitute irreparable injury . . . ." (quotation and citation omitted)); *N.C. Util. Comm'n v. FERC*, 653 F.2d 655, 662 (D.C. Cir. 1981) (holding NCUC hadn't shown aggrievement despite its contention that the challenged order "was used to its disadvantage in [other legal] proceedings").

[18] *See Ultra*, 28 F.4th at 635 (pipeline company asserted that Ultra could not reject its filed-rate contracts without FERC's approval, even though FERC had issued no order).

No. 21-60017
No. 21-60200

Supreme Court and this court have said that mere "expense and annoyance" inflicted by agency proceedings does not aggrieve a party.[19]

Throughout its briefing, however, Gulfport asserts a third injury: the legal effects of FERC's orders.[20] It contends that the orders purport to block it from ceasing performance of rejected filed-rate contracts, which the law entitles Gulfport to do. Gulfport also attacks FERC's position that "the act of filing a contract with FERC creates a separate and independent 'filed rate' obligation that enshrines the terms of the contract into federal law," nullifying the effects of rejection.[21] If FERC's orders stand, Gulfport will have to choose between renouncing its legal rights under the Code or flouting

---

[19] *Energy Transfer Partners*, 567 F.3d at 141 (citation omitted); *see also, e.g.*, *FTC v. Standard Oil Co.*, 449 U.S. 232, 242 (1980) (filing of complaint by agency did not aggrieve a petitioner); *Tenneco*, 688 F.2d at 1022.

[20] *See, e.g.*, Appellant's Br. at 50 ("The filed-rate doctrine gives FERC no authority to demand continued performance from all parties under a filed-rate contract as a matter of federal law, or to prevent a party from breaching a filed-rate contract and paying damages based on the filed rate."); Appellant's Br. at 42 ("FERC cannot effectively nullify the bankruptcy court's exclusive authority over rejection by attempting to force the debtor to continue performing under the terms of its filed rate."); Appellant's Br. at 39 ("[T]he orders . . . assert that FERC has the authority to effectively negate a bankruptcy court's decision to approve rejection, on the theory that rejection 'modifies' or 'abrogates' the filed rate and therefore the debtor cannot cease performing under a rejected contract unless FERC provides separate approval." (alterations adopted)); Appellant's Br. at 62 ("[N]either the Bankruptcy Code nor any other legal authority empowers FERC to prevent the confirmation of a bankruptcy plan solely because it involves the rejection of a filed-rate contract. To the extent that the FERC orders here claim that power, they are unlawful and must be set aside on that ground as well.").

[21] Appellant's Br. at 48 (citing *ETC Tiger*, 171 FERC ¶ 61,248, at ¶ 22); *accord ETC Tiger*, 171 FERC ¶ 61,248, at ¶ 22 ("[Filed-rate] contracts are not typical commercial contracts but rather establish public obligations that carry the force of law. . . . [F]iled rate obligations exist independently of private contractual duties *and continue to bind the counterparties, regardless of one party's breach of contract* . . . . [A] debtor does not extinguish its filed rate obligations under the NGA by rejecting a contract in bankruptcy." (emphasis added) (footnotes omitted)).

FERC's commands either by not performing the TSAs or by seeking to reject those contracts without FERC's consent.

That injury sustains Gulfport's standing. FERC's orders left no doubt that Gulfport could not reject the TSAs or cease performing them without its approval—no matter what the bankruptcy court decided. Because the "rejection of a [filed-rate] contract in bankruptcy court alters the essential terms and conditions" of that contract, the orders explained, "the Commission's approval is required to modify or abrogate the filed rate." The orders even purported to bind the bankruptcy court, warning that the court could not confirm a reorganization plan "that purports to authorize the . . . rejection of the Gulfport TSAs . . . unless and until the Commission agrees."

The paper-hearing order reiterated those findings and concluded that continued performance under the TSAs would not harm Gulfport. If affirmed, those orders would confine Gulfport's bankruptcy-law rights and the bankruptcy court's power to permit their exercise. That injury to a petitioner's legal rights is classic aggrievement. *Atlanta Gas Light Co. v. FPC*, 476 F.2d 142, 147–48 (5th Cir. 1973).

That injury might not matter if FERC's orders suggested only how the agency *might* act in some later case, *see, e.g.*, *Sun Oil Co. v. FPC*, 304 F.2d 290, 292 (5th Cir. 1962), or if the agency had no power to enforce its orders.[22] But neither circumstance is present here.

To the first point, FERC insists that its orders have legal force. FERC even says that we must defer to the orders, *see Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984), so far as they interpret FERC's "juris-

---

[22] *See California*, 141 S. Ct. at 2115 (there was no standing because "textually unenforceable language" in the challenged statute could not injure the plaintiffs).

diction and responsibilities" under the statutes the agency administers.[23] And Congress doubtless expects FERC's formal adjudications to carry the force of law. *See United States v. Mead Corp.*, 533 U.S. 218, 229–31 (2001); 5 U.S.C. § 554(e). Legal consequences flow from the orders. *See, e.g.*, *Cent. Freight Lines v. ICC*, 899 F.2d 413, 417–18 (5th Cir. 1990).

To the second point, FERC can enforce its orders. The NGA authorizes civil penalties against "[a]ny person" who "violates . . . any . . . [Commission] order," 15 U.S.C. § 717t-1(a), as well as criminal penalties against persons who violate such an order "willfully and knowingly," § 717t(b). To chance those penalties is to chance ruin. The civil-penalty statute caps penalties at "$1,000,000 per day per violation for as long as the violation continues." § 717t-1(a). Suffice to say, FERC's orders are no paper tigers.

Where a petitioner is himself "an object of the [government] action" he says is illegal, "there is ordinarily little question that the action . . . caused him injury, and that a judgment preventing . . . the action will redress it." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). So here.

Gulfport has standing.

## B.

Likewise, the orders are ripe for review.

"Ripeness doctrine reflects Article III limitations on judicial power." *Cochran v. SEC*, 20 F.4th 194, 212 (5th Cir. 2021) (en banc) (cleaned up), *cert. granted*, 142 S. Ct. 2707 (2022). "At its core, ripeness is a matter of timing that serves to prevent courts from entangling themselves in cases prematurely." *Walmart Inc. v. U.S. Dep't of Just.*, 21 F.4th 300, 312 (5th

---

[23] Appellee's Br. at 25 (citing *City of Arlington v. FCC*, 569 U.S. 290, 301–04 (2013)).

No. 21-60017
No. 21-60200

Cir. 2021).[24] "The ripeness inquiry hinges on two factors: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration." *Cochran*, 20 F.4th at 212 (cleaned up).[25] Both factors point toward justiciability here.

The orders are fit for review. A matter is fit for review when it presents pure legal questions that require no additional factual development. *Ibid.* That's true here. According to Gulfport, FERC lacked statutory jurisdiction to issue the orders and, by misapprehending the effect of rejection in bankruptcy, flouted our caselaw and the Bankruptcy Code. Those are pure legal questions that require no further factual development. The challenged orders are final, the record is complete, and FERC has stated its views. It's clear "exactly what obligations" FERC purports to impose on Gulfport, so the orders are fit for our review. *Walmart*, 21 F.4th at 311.

Gulfport also suffers hardship from the orders. To assess hardship, we examine the effect of the agency decision on the petitioner. *Abbott Lab'ys*, 387 U.S. at 152. If it is "sufficiently direct and immediate," review is appropriate. *Ibid.* Finality is again relevant. If the risk that the order poses to the petitioner will ripen into injury only after the agency takes, or does not take, some *further* action, then the matter "remain[s] open for contest" and thus is "not ripe for decision." *Brooklyn Union Gas*, 190 F.3d at 374. But here, FERC's orders are final and unequivocal. No further action is necessary for those orders to bind Gulfport. That purported legal effect, plus the agency's

---

[24] *See also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967) (ripeness ensures that courts don't "entangl[e] themselves in abstract disagreements").

[25] This court has considered two other factors: whether the agency action is final and whether resolving the disputed issues will "have a direct and immediate impact upon the petitioners." *Energy Transfer Partners*, 567 F.3d at 140 (citation omitted). But those factors collapse into fitness and hardship, so we need not address them separately.

allegedly wrongful assertion of jurisdiction, harms Gulfport today. If we can't review the orders now, they will be unreviewable.

The pendency of Gulfport's rejection motions before the bankruptcy court does not render this dispute unripe. Ripeness does not demand that an injury be certain. Instead, the feared injury need only be "sufficiently likely to happen to justify judicial intervention," and not "abstract or hypothetical." *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1153 (5th Cir. 1993) (citation omitted). That standard is met here. As the district court explained, *Ultra* forecloses Rover's objections to rejection. And the bankruptcy court's opinion on withdrawal of the reference leaves little doubt that the court will allow Gulfport to reject the disputed contracts.

But even if the bankruptcy court did not allow rejection, this court still would have to decide whether FERC had statutory authority to issue the orders. We have said before that FERC's *failure* to exercise jurisdiction is reviewable where the agency "considered its jurisdiction" and where the petitioner "would suffer hardship by not having access to a judicial forum to review" the agency's decision. *W. Refin. Sw., Inc. v. FERC*, 636 F.3d 719, 722 (5th Cir. 2011).

Both points hold true here. Only this court can review FERC's statutory authority to issue the orders, and only this court can vacate the orders. Though the bankruptcy court could block FERC from "negat[ing] [Gulfport's] rejection," *Ultra*, 28 F.4th at 638 (citation omitted), it could not do more than opine on the agency's assertion of jurisdiction—lest it exceed its *own* jurisdiction.[26] Unless we review the orders, Gulfport could not challenge

---

[26] *See ibid.* ("[A]ny injunction [must] be limited to protecting [the debtor] from FERC's attempts to compel [it] to perform under the particular contract that the court enabled [the debtor] to reject."); *see also* 11 U.S.C. § 105(a) (limiting the bankruptcy court's power to actions "necessary or appropriate *to carry out the provisions of* [the Bankruptcy

them.

*Cochran* confirms that this dispute is ripe. There, the en banc court allowed a challenge to the "entire legitimacy" of proceedings before an administrative law judge even though the agency proceedings had yet to conclude. 20 F.4th at 209. The challenge was ripe because withholding review would have forced the petitioner to endure an unlawful proceeding, which, if resolved in her favor on the merits, would destroy her ability to contest its legality. *Id.* at 212–13. Surely if a challenge is ripe *during* the unlawful proceedings, it is ripe *after* they occur.

FERC's orders are definitive, and they injure Gulfport. They are ripe for review in this court.

## C.

Mootness is our last stop. FERC contends that *Ultra* mooted Gulfport's petitions for review by clarifying that bankruptcy courts "may authorize a valid rejection of FERC-jurisdictional contracts" without the agency's approval. Though FERC correctly states *Ultra*'s holding, it does not moot Gulfport's petitions.

"A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (cleaned up). Thus, mootness results when a party receives complete relief in another judicial proceeding.[27]

But *Ultra* gave Gulfport no relief at all; it relieved different debtors

---

Code]" (emphasis added)).

[27] *See, e.g.*, *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 962–63 (5th Cir. 2014) (state supreme court decision that invalidated the contested statute mooted plaintiffs' federal challenge to it).

No. 21-60017
No. 21-60200

from different filed-rate contracts.  Gulfport asks us to vacate agency orders regarding its *own* filed-rate contracts.  So long as those orders remain in force, Gulfport retains "a concrete interest . . . in the outcome of the litigation," and that means "the case is not moot."  *Chafin*, 568 U.S. at 172 (citation omitted).

Nor has FERC conceded the merits of this dispute, such that no case or controversy remains.  Though its supplemental briefing acknowledges that *Ultra* confines the agency's power in some respects, FERC has not disclaimed its asserted power to require continued performance of filed-rate contracts after a valid rejection.  Nor does it concede that it lacked statutory authority to issue the orders before us.  Instead, FERC persists in defending its "uniform, nationwide approach" to the rejection of filed-rate contracts—an approach that the agency says "reflects a reasonable interpretation" of Supreme Court precedent and its regulatory duties.  And at oral argument, FERC's counsel asked this court to affirm the agency's paper-hearing order on the merits, instead of vacating it as moot.  Oral Arg. at 16:10–17:45, 23:45–24:36.

Those are not concessions.  This dispute is live.

### III.

Having confirmed our jurisdiction, we proceed to the merits.

Gulfport attacks FERC's orders on two fronts.  Gulfport first says that FERC lacked authority to issue them.  It then contends that the orders are unlawful because they violate the Bankruptcy Code and purport to restrain Gulfport's bankruptcy-law rights and the powers of the bankruptcy court.

FERC did have authority to issue the orders.  But because the orders rested on an inexplicable misunderstanding of rejection, we vacate them all.

### A.

Gulfport's challenge to FERC's authority goes like this:  The agency,

No. 21-60017
No. 21-60200

"in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e); *see also* 18 C.F.R. § 385.207(a)(2). FERC issued its declaratory order to remove "uncertainty . . . regarding the status of" the TSAs with Gulfport and the treatment of those Gulfport TSAs "should Gulfport file for bankruptcy."[28] But the order did not remove any uncertainty; it instead *created* uncertainty regarding Gulfport's bankruptcy-law rights. So FERC lacked authority to issue the declaratory order, requiring that we vacate that order and the paper-hearing order it spawned. 5 U.S.C. § 706(2)(C).

But whether FERC's order in fact created uncertainty is not the question. We must decide whether the agency abused its discretion. *Merchs. Fast Motor Lines v. ICC*, 5 F.3d 911, 915–16 (5th Cir. 1993).[29] In other words, did FERC "articulate a satisfactory explanation for its decision, including a rational connection between the facts found and the choice" to issue the order? *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019) (cleaned up).[30] That bar is low, and FERC clears it.

Gulfport points to some facts that suggest otherwise. When FERC issued the declaratory order, "Gulfport had not filed for bankruptcy, much less moved to reject any TSA." Plus, FERC had stated its views on the rejection of filed-rate contracts in at least two other administrative adjudications. The declaratory order set a paper hearing regarding whether the TSAs' filed

---

[28] Because FERC has not argued that the orders "terminate[d] a controversy," 5 U.S.C. § 554(e), this court may not consider that justification for the contested orders, *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given." (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

[29] *See also Intercity Transp. Co. v. United States*, 737 F.2d 103, 106–07 (D.C. Cir. 1984) (reviewing an agency's declaratory orders for abuse of discretion).

[30] *See also State Farm*, 463 U.S. at 43 (citing *Chenery*, 332 U.S. at 196).

rates should be modified or abrogated. But that hearing could not remove uncertainty, Gulfport says, because no one had sought to change or cancel those filed rates. And because FERC "left the door wide open for different determinations in the future," its paper-hearing order could not remove any future uncertainty about the filed rates.

True, Gulfport had not sought bankruptcy protection when the agency issued its order. And we agree that a declaratory order unmoored from any real-world controversy would exceed the agency's power.[31] But FERC did not issue its orders because someone, someday might file for bankruptcy. *Cf. Hollister Ranch Owners' Ass'n v. FERC*, 759 F.2d 898, 903 (D.C. Cir. 1985). It issued them because Gulfport had announced to the world that *it* might file for bankruptcy. In a public financial filing, Gulfport had warned that market conditions had "significantly impaired its ability to access capital markets" and created "'substantial doubt' about [its] ability to continue" operating. That admission suggested that the legal status of Gulfport's filed-rate contracts might soon be disputed in bankruptcy. FERC did not abuse its discretion by trying—however clumsily—to assuage that uncertainty.

We attribute no significance to the fact that FERC had stated its views on rejection in other administrative proceedings. Those proceedings did not bind Gulfport or address Gulfport's filed-rate contracts. And they did not dictate the orders here: Before issuing those orders, FERC could have changed its views or declined to extend them to Gulfport and its contracts.

FERC gave rational reasons for finding that its orders would remove uncertainty, so it had authority to issue them. We find no abuse of discretion there. *Cf. Dep't of Com.*, 139 S. Ct. at 2569.

---

[31] *Cf. City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012), *aff'd on other grounds*, 569 U.S. 290 (2013).

No. 21-60017
No. 21-60200

B.

But the orders are unlawful. Each rests on the premise that rejecting a filed-rate contract in bankruptcy is something more than a breach of contract. That premise is wrong, so we must vacate the orders.

Let's first review what the principal orders had to say.

FERC's declaratory order asserted "parallel, exclusive jurisdiction" over Gulfport's filed-rate contracts. By that oxymoron, the agency meant that only it could decide whether to effect a rejection that a bankruptcy court had authorized. "The rejection of a [filed-rate] contract in bankruptcy court," the order explained, "alters" that contract's "essential terms and conditions." And because the NGA empowers the agency to decide whether to "modify or abrogate [a] filed rate," see 15 U.S.C. §§ 717c, 717d(a), FERC concluded that "any . . . action in a bankruptcy proceeding that purports to authorize the . . . rejection of the Gulfport TSAs" cannot proceed "unless and until the Commission agrees."[32]  The order then set a paper hearing to determine whether modifying or abrogating the filed rate—as it claimed rejection would do—would serve the public interest.

Next came the paper-hearing order. To no one's surprise, FERC accepted Rover's claim that "continued performance under the Gulfport [TSAs] does not seriously harm the public interest." Just like the declaratory order, the paper-hearing order assumed that rejection would modify or abrogate the filed rates and, accordingly, that FERC could require Gulfport to continue performing its contracts. The order acknowledged Gulfport's fear that "a Commission order finding that the [filed-rate contracts] should be per-

---

[32] Despite those assertions, the order stressed—and FERC still maintains—that the agency "neither presumes to sit in judgment of rejection motions nor seeks to arrogate the role of adjudicating bankruptcy proceedings." We cannot square those statements.

formed" would worsen its financial distress. But the record, FERC said, did not "support a conclusion that Gulfport will suffer sufficient financial harm" from "the contracts remaining in effect."

Both orders thus purport to require Gulfport to continue performing contracts that it would reject in bankruptcy. They even purport to bar the bankruptcy court from allowing rejection. Those ambitious holdings assume that rejecting a contract changes or cancels the obligations under that contract. That assumption is wrong. It flouts the Bankruptcy Code, Supreme Court precedent, and the caselaw of every federal circuit.

Rejection does not change or rescind a contract. It breaches that contract, excusing the debtor's future performance but converting it into a claim for damages. The Bankruptcy Code says that: "[T]he rejection of an executory contract . . . of the debtor constitutes a breach of such contract or lease." 11 U.S.C. § 365(g). The Supreme Court says that: "Rejection is breach, and has only its consequences." *Mission Prod.*, 139 S. Ct. at 1663. "Rejection of a contract—*any* contract—in bankruptcy operates not as a rescission but as a breach." *Id.* at 1661 (emphasis added). And so say every federal circuit, the leading bankruptcy treatises, and respected bankruptcy scholars.[33] Against

---

[33] *E.g.*, Douglas G. Baird, The Elements of Bankruptcy 114 (6th ed. 2014) ("For most purposes, you can safely assume that rejection of an executory contract in bankruptcy has the same consequences as breach of the same contract outside of bankruptcy."); 3 Collier on Bankruptcy ¶ 365.10[3] (16th ed. 2022) ("Rejection is a breach, not a rescission."); 2 Norton Bankruptcy Law & Practice § 46:24 (3d ed.), Westlaw (database updated Apr. 2022) ("The Bankruptcy Code instructs us that rejection is a breach of the executory contract. It is not avoidance, rescission, or termination." (footnotes omitted)); *see also, e.g.*, *Pub. Serv. Co. v. N.H. Elec. Coop., Inc.* (*In re Pub. Serv. Co.*), 884 F.2d 11, 14 (1st Cir. 1989) ("[R]ejection 'constitutes a breach of such contract.'" (citation omitted)); *Lehman Bros. Special Fin. Inc. v. Branch Banking & Tr. Co.* (*In re Lehman Bros. Holdings Inc.*), 970 F.3d 91, 102 (2d Cir. 2020) ("If the contract is a bad deal for the debtor, the Code enables the debtor to reject it, repudiating any further performance of its duties. The Code explains that the rejection of an executory contract constitutes a breach of such contract." (cleaned up)); *Enter. Energy Corp. v. United States* (*In re Columbia Gas*

No. 21-60017
No. 21-60200

that crush of contrary authority, FERC cited only *itself*—for the notion that rejection of a filed-rate contract "alters [its] essential terms and conditions." Not once did its declaratory order cite the rejection statute, 11 U.S.C.

*Sys.*), 50 F.3d 233, 239 n.8 (3d Cir. 1995) ("Rejection . . . is equivalent to a nonbankruptcy breach. Rejection leaves the nonbankrupt with a claim against the estate just as would a breach in the nonbankruptcy context . . . ." (citation omitted)); *Stewart Foods v. Broecker* (*In re Stewart Foods*), 64 F.3d 141, 144 (4th Cir. 1995) ("The rejection of an executory contract constitutes a breach of the contract, and a party's damages resulting from that rejection are treated as a pre-petition claim and receive the priority provided to general unsecured creditors."); *O'Neill v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines*), 981 F.2d 1450, 1459 (5th Cir. 1993) ("[The rejection statute] speaks only in terms of 'breach.' The statute does not invalidate the contract, or treat the contract as if it did not exist."); *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 503 (6th Cir. 2021) ("Rejection does not terminate the contract. Instead, the contract is considered breached." (citation omitted)); *Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012) (Easterbrook, C.J.) ("What § 365(g) does by classifying rejection as breach is establish that in bankruptcy, as outside of it, the other party's rights remain in place. After rejecting a contract, a debtor is not subject to an order of specific performance. The debtor's unfulfilled obligations are converted to damages . . . . [R]ejection is not the functional equivalent of a rescission . . . . It merely frees the estate from the obligation to perform . . . ." (quotations and citations omitted)), *followed by Mission Prod.*, 139 S. Ct. at 1659; *Lewis Bros. Bakeries, Inc. v. Interstate Brands Corp.* (*In re Interstate Bakeries Corp.*), 751 F.3d 955, 961 (8th Cir. 2014) (en banc) ("If . . . the debtor-in-possession rejects a contract, § 365(g) provides that the rejection 'constitutes a breach of such contract.' Rejection 'frees the estate from the obligation to perform' under the contract by converting the debtor's unfulfilled obligations to damages." (citation omitted)); *First Ave. W. Bldg., LLC v. James* (*In re Onecast Media*), 439 F.3d 558, 563 (9th Cir. 2006) ("Rejection . . . . constitutes a breach of a contract which permits the other party to file a creditor's claim." (citations omitted)); *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. of Tulsa* (*In re W. Real Est. Fund*), 922 F.2d 592, 595 (10th Cir. 1990) (per curiam) ("[T]he rejection of an executory contract constitutes a *breach* of that contract, for which damages ordinarily allowed in contract are available." (cleaned up)); *Medley v. Dish Network, LLC*, 958 F.3d 1063, 1068 (11th Cir. 2020) ("Rejection of a contract constitutes a breach of the contract immediately before the filing of the bankruptcy petition. Rejection does not dissolve or nullify the contract." (citation omitted)); *Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1201 n.3 (D.C. Cir. 1998) (acknowledging that "rejection of an executory contract . . . is treated as [a] breach"); *Fraunhofer-Gesellschaft Zur Förderung Der Angewandten Forschung E.V. v. Sirius XM Radio Inc.*, 940 F.3d 1372, 1376 (Fed. Cir. 2019) ("Worldspace's rejection was equivalent to a breach occurring immediately before the date of the filing of the bankruptcy petition." (cleaned up)).

§ 365(g).

The hornbook law of rejection yields a clear answer. Rejection is just a breach of contract; it transforms the debtor's future performance into an unsecured claim for damages. *Mirant*, 378 F.3d at 520 (citing 11 U.S.C. §§ 365(g), 502(g)). Rejecting the gas transit contracts would breach those contracts, giving Rover a damages claim. And that claim is valued at the filed rate; that rate does not change. Though Gulfport may be unlikely to pay that claim in full, that does not change the contract's terms or the filed rate itself. *Id.* at 520–21.[34]

FERC urges that this dispute is different because it involves filed-rate contracts. But we have twice rejected that contention, and we again reject it today. *Mirant* held, and *Ultra* reaffirmed, that "a bankruptcy court can authorize rejection of a filed-rate contract, and that, post-rejection, FERC cannot require continued performance on the rejected contract." *Ultra*, 28 F.4th at 639; *accord Mirant*, 378 F.3d at 523. With filed-rate contracts, as with others, rejection is a breach and has only its consequences. *Mission Prod.*, 139 S. Ct. at 1662.

Nor will we defer to FERC's bizarre view of rejection. We sometimes defer to an agency's "permissible construction" of a statute it administers. *City of Arlington*, 569 U.S. at 296 (quoting *Chevron*, 467 U.S. at 843). But

---

[34] *See also In re Extraction Oil & Gas*, 622 B.R. 608, 625 (Bankr. D. Del. 2020) (Sontchi, C.J.) ("[N]othing in this Court's ruling changes the rates . . . . [T]he Rejection Counterparties have and will file claims at the rates approved by FERC and this Court is doing nothing to abrogate those approved rates. How and when those claims will be paid-out is an issue for the plan and confirmation process." (footnote omitted)); Bradley G. Oster, Comment, *Reigning in Regulatory Overreach: FERC's Role in Bankruptcy*, 82 La. L. Rev. 625, 674 (2022) ("To be clear, a court's authorization of rejection does nothing to affect the rate charged. The counterparty will file its pre-petition claim for damages based on the FERC-approved rates . . . ." (footnote omitted)).

FERC does not administer the Bankruptcy Code.  And even if it did, we would reject its view of rejection, which patently contradicts the Code's text and established interpretation.[35]

Rover, the pipeline company, contends that we need not follow *Mirant* or *Ultra* here.  It offers three reasons.  Each is meritless.

The first is that Gulfport seeks review of FERC orders, not bankruptcy-court orders as in *Mirant* and *Ultra*.  That distinction is meaningless. The posture of these petitions for review does not change the effect of rejection or the agency's powerlessness to require continued performance of a rejected contract.

The second is that FERC "completed its administrative process *before* Gulfport filed [for] bankruptcy."  There is no basis for that distinction.  FERC cannot require continued performance of a filed-rate contract that is validly rejected—whether it purports to do so before, during, or after the bankruptcy proceeding.  The proper forum for FERC's views is the bankruptcy court, which must invite those views but is free to reject them.  *See Ultra*, 28 F.4th at 642–43.

The third reason, Rover says, is that the Supreme Court overruled *Mirant* and *Ultra*.  *Mirant* held that rejecting a filed-rate contract just breaches that contract.  *Mirant* premised that holding, Rover says, on a "negative inference" from the fact that no part of the statute governing rejection requires the input of regulatory commissions like FERC.  But *Mission Product*, Rover claims, "rejected this very same negative inference in the very same statute, holding that § 365 is not 'a neat, reticulated scheme of narrowly tailored

---

[35] *See Djie v. Garland*, No. 20-60448, --- F.4th ---, 2022 WL 2339710, at *4 (5th Cir. June 29, 2022) ("Under *Chevron*, the statute's plain meaning controls, whatever the agency might have to say." (cleaned up)).

exceptions,' but a 'mash-up of legislative interventions.'" (Quoting *Mission Prod.*, 139 S. Ct. at 1664.)

Rover misreads *Mission Product*. The rejector in *Mission Product* had invoked a different negative inference: that Congress had abandoned the rule that rejection is just a breach of contract by enumerating exceptions to it. Dismissing that view, the Court observed that Congress devised the statute's "exceptions" to "whack[ ]" judicial decisions that had treated rejection as something *more* than a breach of contract. *Mission Prod.*, 139 S. Ct. at 1664.[36] So *Mission Product* confirmed *Ultra* and *Mirant*; it did not overrule them.

\* \* \* \* \*

FERC can decide whether *actual* modification or abrogation of a filed-rate contract would serve the public interest. It even may do so before a bankruptcy filing. But rejection is just a breach; it does not modify or abrogate the filed rate, which is used to calculate the counterparty's damage. So FERC cannot prevent rejection. It cannot bind a debtor to continue paying the filed rate after rejection. And it cannot usurp the bankruptcy court's power to decide Gulfport's rejection motions.

That leaves the question of remedy. We may "affirm, modify, or set aside" FERC orders "in whole or in part." 15 U.S.C. § 717r(b). But we must "set aside agency action" that is "not in accordance with law," 5 U.S.C. § 706(2)(A), and FERC's mistaken view of rejection infected every order on review. We can leave no doubt that those orders won't bind the petitioner. So we vacate them all. 15 U.S.C. § 717r(b).

---

[36] *See also ibid.* ("This mash-up of legislative interventions . . . affirmatively refutes [the rejector's] rendition. . . . Whenever Congress has been confronted with the consequences of the view that rejection terminates all contractual rights, it has expressed its disapproval." (cleaned up)).

No. 21-60017
No. 21-60200

The petitions for review are GRANTED. The four challenged orders are VACATED.